**In the Matter of the PRESIDENT'S COMMISSION ON ORGANIZED CRIME SUBPOENA OF Nicodemo SCARFO.**

**Appeal of UNITED STATES of America.**

**No. 85–5539.**

United States Court of Appeals, Third Circuit.

Argued Jan. 8, 1986.

Decided Feb. 14, 1986.

As Amended Feb. 19, 1986.

James D. Harmon, Jr., Executive Director and Chief Counsel, Jonathan J. Rusch (argued), Counsel, President's Com'n on Organized Crime, John F. De Pue (argued), Dept. of Justice, Washington, D.C., Thomas W. Greelish, U.S. Atty., D. New Jersey, Camden, N.J., for appellant.

Harry Lore (argued), and Robert F. Simone, Philadelphia, Pa., for appellee.

Before WEIS, BECKER and STAPLETON, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

The individuals appointed to the President's Commission on Organized Crime included a retired Supreme Court Justice and an active circuit judge. The movant, who was subpoenaed to appear before the Commission contends that its composition is unconstitutional because the inclusion of judges as members violates the separation of powers principle. We disagree and conclude that no constitutional transgression exists.

In the district court, movant Scarfo presented a motion to quash the subpoena served on him by the Commission. The court granted the motion, and the Commission has appealed.

Created by an executive order, the Commission was established to conduct a national analysis of organized crime, including its nature, its sources and amounts of income, information on participants, and evaluation of pertinent federal laws. The Commission "shall advise the President and the Attorney General with respect to its findings and actions which can be under-

taken to improve law enforcement efforts directed against organized crime, and make recommendations concerning appropriate administrative and legislative improvements and improvements in the administration of justice." Exec. Order No. 12435, 3 C.F.R. § 202 (1983).

The President appointed nineteen individuals to the Commission, including the Honorable Potter Stewart, a retired Justice of the Supreme Court,[1] two members of Congress, and representatives of the academic and private sectors as well as the law enforcement community. Judge Irving R. Kaufman, an active circuit judge from the United States Court of Appeals for the Second Circuit, was designated chairman.

To enable the Commission to carry out its assignments, Congress enacted Pub.L. No. 98–368, 98 Stat. 490 (1984), which grants authority to hold hearings and issue subpoenas. The statute deems the Commission a law enforcement agency to the extent the Right to Financial Privacy Act of 1978, 12 U.S.C. §§ 3401–22 (1982), may be invoked. Its members are investigative or law enforcement officers for purposes of access to information gained through wiretaps under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 (1982). Thus, Commission members are given the right to examine documents and other evidence not available to the judiciary and the public at large.

The enabling statute requires the Commission to apply to the district courts for enforcement of subpoenas and for writs of habeas corpus *ad testificandum*. When appropriate, the Commission is authorized to seek witness immunity from the Attorney General. In addition, the Attorney General is directed to provide the Commission with administrative services, funds, facilities, staff, and other support personnel.

The Commission has conducted hearings in various parts of the country, summoning as witnesses law enforcement officials, victims of organized criminal groups, and former participants in illegal or questionable activities. On June 5, 1985, the Commis-

---

**1.** Justice Stewart died during the pendency of these proceedings.

sion issued a subpoena to the movant Nicodemo Scarfo, ordering him to appear at a hearing in New York City on June 24. Rather than responding, he filed a motion in the district court in New Jersey to quash the subpoena.

In support of the motion, Scarfo alleged that in a prosecution pending in the district court, *United States v. Leonetti*, Cr. No. 84–253 (D.N.J.1984), he was described as "the head of the Scarfo organization" and named as an unindicted co-conspirator. He averred that his attendance before the Commission was for purposes associated with the *Leonetti* case and therefore was in violation of the Federal Advisory Committee Act, 5 U.S.C.A. app. 2 at 158 (Supp. 1985), which underlies Executive Order No. 12435. Scarfo also alleged that, according to a newspaper account, the prosecutor and a government undercover agent participating in the *Leonetti* case had met with members of the Commission staff.

The Commission denied having had any discussions with the Justice Department about the *Leonetti* prosecution and stated that neither Justice Stewart nor Judge Kaufman had personally participated in the decision to issue the Scarfo subpoena. At oral argument before the district court, Scarfo's counsel agreed that the thrust of his motion to quash the subpoena was the unconstitutionality of the Commission based on a breach of the separation of powers doctrine.

Following the decision of the Court of Appeals for the Eleventh Circuit in *In re Application of the President's Commission on Organized Crime, Subpoena of Lorenzo Scaduto*, 763 F.2d 1191 (11th Cir. 1985) (*Scaduto* ), the district judge concluded that the presence of two members of the federal judiciary on the Commission violated the United States Constitution. He therefore quashed the subpoena, reasoning that the Commission's existence was tainted with illegality.

On appeal, the Commission contends that the appointment of members of the judiciary to the Commission does not encroach on the authority of the other branches of government or derogate the institutional authority of the judicial branch. For the first time, the Commission also argues that the movant has no standing to raise the constitutional issue.

Scarfo asserts that the Commission acts as a law enforcement body and that the extrajudicial service of federal judges on such a body violates the constitutional doctrine mandating separation between the three branches of the government. He argues that participation by the judges in the Commission's work offends the ethical norms of federal judges, and casts a cloud of public doubt on the impartiality of the bench. He further contends that the Commission has waived the standing issue by failing to raise that defense in the district court.

### I.

On the standing question, the Commission argues that Scarfo has failed to show any personal injury or that he might be harmed as the result of judicial participation in the Commission's activity. In its view, Scarfo lacks standing because his stake is no greater than any other citizen's generalized interest in proper governmental function. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). The Commission relies on *Blair v. United States*, 250 U.S. 273, 281, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919), which observed that the "personal sacrifice involved [in testifying before a court or grand jury] is a part of a necessary contribution of the individual to the welfare of the public."

To determine standing, we do not examine the merits of the underlying controversy. As this court has observed, the "Supreme Court when reviewing the standing of a particular litigant has focused on the allegations set forth in the claimant's complaint to determine whether he meets the relevant standing test." *Schiaffo v. Helstoski*, 492 F.2d 413, 423 (3d Cir.1974), citing *Sierra Club v. Morton*, 405 U.S. 727, 731, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636

(1972) and *Association of Data Processing Serv. v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). Accordingly, the inquiry centers on the plaintiff's pleadings, and "standing is generally determined from the face of the complaint." *Borelli v. City of Reading,* 532 F.2d 950, 951 (3d Cir.1976). Thus, the issue here is whether Scarfo has alleged injury sufficient to give him access to a judicial remedy.

In *Allen v. Wright,* 468 U.S. 937, ——, 104 S.Ct. 3315, 3318, 82 L.Ed.2d 556 (1984), the Supreme Court summarized the standing doctrine: "The requirement of standing ... has a core component derived directly from the Constitution. A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."

By questioning Scarfo's allegation of "injury in fact," the Commission contests the court's authority to redress the alleged wrong. The court's responsibility to determine whether a case or controversy exists is a threshold matter which cannot be waived and which can be undertaken at any point in the proceedings. *See Jenkins v. McKeithen,* 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). *See also Valley Forge College of Americans United,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Moreover, we must decide the issue of standing "even though the court below passed over it without comment." *McKeithen,* 395 U.S. at 421, 89 S.Ct. at 1849.

Scarfo asserts that he has met the actual injury requirement. The motion to quash alleges that his appearance before the Commission was sought in connection with a pending criminal prosecution. In addition, he points to statements of the President and Chairman that one of the purposes of the Commission is "exposure" of "organized crime", "career criminals", and this "menace."

Since district court documents refer to Scarfo as a leader of a criminal organization, it is clear that he is not being summoned as a law enforcement official or a victim of organized crime, but as one of the targets of the investigation. The case, therefore, comes within the rationale of *Jenkins v. McKeithen,* where the Court found that a plaintiff had standing to contest the constitutionality of a state legislative commission investigating possible criminal violations in labor-management relations.

The complaint in *McKeithen* alleged that the state commission had caused the plaintiff to be branded as a criminal and had caused baseless charges to be brought against him. Even though the Commission had not subpoenaed the plaintiff to appear before it, the Court concluded that he had adequately set forth sufficient injury to "his own legally protected interests to accord him standing to challenge the validity of the Act." 395 U.S. at 424, 89 S.Ct. at 1850. "[T]he personal and economic consequences alleged to flow from such actions are sufficient to meet the requirement that appellant prove a legally redressable injury." *Id.* "Appellant's allegations go beyond the normal publicity attending criminal prosecution; he alleges a concerted attempt publicly to brand him a criminal without a trial." *Id.* at 424–25, 89 S.Ct. at 1850.

Abuses of the investigative process may lead to an abridgement of constitutional freedoms. In *Watkins v. United States,* 354 U.S. 178, 197, 77 S.Ct. 1173, 1184, 2 L.Ed.2d 1273 (1957), the Court said "the mere summoning of a witness and compelling him to testify, against his will, about his beliefs, expressions or associations is a measure of governmental interference. And when those forced revelations concern matters that are unorthodox, unpopular or even hateful to the general public, the reaction in the life of the witness may be disastrous."

*Watkins* and *McKeithen* are easily distinguishable from *Blair v. United States,* 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919) on which the Commission relies. In the latter case, the witnesses challenged the authority of a grand jury that had

subpoened them, arguing that the crime under investigation was not within the federal jurisdiction. The witnesses could not allege the personal harm set out in the *Watkins* and *McKeithen* cases. Consequently, in *Blair* the Court was able to find as potential injury only the inconvenience suffered by anyone called to testify before a grand jury—obviously not enough to satisfy the constitutional requirement of actual injury.

The Commission also maintains that Scarfo has failed to demonstrate a causal relationship between the harm alleged and the alleged constitutional violation, specifically, that his injury was caused by the presence of Justice Stewart and Judge Kaufman on the Commission. Because the two judges had taken no part in the issuance of the subpoena, the Commission contends their membership is irrelevant. The district court concluded that the exclusion of the two judicial members from the actual process of issuing subpoenas was ineffective to shield the Commission from inquiry into its constitutional legitimacy.

We are in agreement with the district court's reasoning on that point. The movant's charge is that the composition of the Commission offends the separation of powers doctrine and that this violation taints all of its activities. It is not the Commission's authority to undertake the specific action that is attacked, but the legality *vel non* of its creation.

Nor is Scarfo's standing defeated by his inability to demonstrate that injury would not have occurred if the judges had not been members of the Commission. The Supreme Court resolved that issue in *Glidden Co. v. Zdanok*, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962), where a separation of powers attack was made on convictions obtained after trials conducted by alleged non-Article III judges. The Court made clear that "the claim advanced by the petitioners ... has nothing to do with the manner in which either of these judges conducted himself in these proceedings." *Id.* at 533, 82 S.Ct. at 1463. In *Buckley v. Valeo*, 424 U.S. 1, 111, 117, 96 S.Ct. 612,

678, 681, 46 L.Ed.2d 659 (1975), the Court said, "litigants with sufficient concrete interests at stake may have standing to raise constitutional questions of separation of powers with respect to an agency designated to adjudicate their rights."

Here Scarfo has asserted injury at the hands of an entity allegedly created in violation of the Constitution. A declaration sustaining his contention would result in quashing the subpoena, thus giving him relief from the threatened injury. Under the *Glidden* rationale, it is unnecessary for him to prove that the same harm would not have occurred at the hands of a properly constituted entity.

■ We conclude, therefore, that Scarfo has adequately demonstrated his standing to present a constitutional challenge to the composition of the President's Commission on Organized Crime.

## II.

The principle of separation of powers implicit in the Constitutional structure is attributed to the writings of Montesquieu. *See Myers v. United States*, 272 U.S. 52, 116, 47 S.Ct. 21, 25, 71 L.Ed. 160 (1926). In support of the doctrine, James Madison wrote, "where the whole power of one department is exercised by the same hands which possess the whole power of another department, the fundamental principles of a free Constitution are subverted." *The Federalist*, No. 47, pp. 325–26 (J. Cooke ed. 1961).

In *Hampton & Co. v. United States*, 276 U.S. 394, 406, 48 S.Ct. 348, 72 L.Ed. 624 (1928), Chief Justice Taft defined the principle in operation:

"in the actual administration of the government Congress ... should exercise the legislative power, the President ... the executive power, and the Courts or the judiciary the judicial power, and in carrying out that constitutional division into three branches it is a breach of the National fundamental law if Congress gives up its legislative power and transfers it to the President, or to the Judicial

branch, or if by law it attempts to invest itself or its members with either executive or judicial power."

As stated in *INS v. Chadha*, 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983), "The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted."

Nevertheless, the Supreme Court has emphasized that the Constitution does not require, or envision, total separation of each of the three essential branches. Only if they function independently within their separate areas, but cooperatively in their relations with each other, may the government, as a whole, perform its constitutional role. Each separate gear must carry out its assigned task while meshing with the others so that power is delivered where needed. The Constitution "enjoins upon [the government's] branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).

As articulated in *Nixon v. Administrator of General Services*, 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977), the proper inquiry focuses on the extent to which the challenged action prevents the affected branch from accomplishing its constitutionally assigned functions. "Only where the potential for disruption is present [need it be determined] whether the impact is justified by an overriding need to promote objectives within the constitutional authority of [the acting branch]."

A legislative attempt to impose administrative functions on the courts occurred soon after their establishment. In 1792, Congress authorized the circuit courts to pass on the right of individuals to be placed on the pension list of Revolutionary War veterans. Those determinations, however, were subject to suspension by the Secre-

tary of War and Congress. The Supreme Court concluded that the duties imposed on the Article III courts by the statute were not judicial powers. The Court also reasoned that neither an executive officer nor Congress may act as a court of errors for the judicial actions of the circuit courts. The statute therefore was held to have violated the separation of powers. *See Hayburn's Case*, 2 U.S. (2 Dall.) 409, 1 L.Ed. 436 (1792); *United States v. Yale Todd*, 54 U.S. (13 How.) 52, 14 L.Ed. 47 (1794).

That same principle was applied in *United States v. Ferreira*, 54 U.S. (13 How.) 40, 14 L.Ed. 42 (1851). There the Court held that Congress could not assign to an Article III court the duty to receive and adjust claims against the United States arising under the Treaty of 1819 with Spain. In that instance, the final determination on payment rested with the Secretary of the Treasury. The Court held that processing claims was not the exercise of judicial power under Article III and therefore the task could not be assigned to the district court as such.

The Court said, however, that it would be permissible for the district judge to act as a commissioner and in that capacity could review and forward claims to the Secretary of the Treasury. The Court construed the statute which purported to confer the duty on the United States district judge as simply identifying the person who was to act as a commissioner.

*Ferreira* stands for the proposition that Congress may impose some extrajudicial duties on Article III judges individually— duties that under the separation of powers doctrine may not be imposed on the courts *qua* courts.

Separation of powers questions are relatively uncomplicated when they involve institutions within the three branches of government. Analysis is more complex when the issue centers on the conduct of individuals holding office within those branches.[2]

**2.** It has been argued that the separation of pow-
ers principle refers to the performance of offi-

The distinction between institutions and personnel becomes somewhat blurred when considering the power of appointment. In *Ex parte Siebold*, 100 U.S. (10 Otto) 371, 25 L.Ed. 717 (1879), the Court concluded that Congress could authorize circuit court appointments of supervisors to oversee congressional elections. The Court reconciled that decision with *Ferreira* and *Hayburn* by finding no incongruity in permitting one branch to appoint persons to serve in another, noting that "it would be difficult in many cases to determine to which department an office properly belonged." 100 U.S. at 397. The Court also observed that the appointing power of the courts is augmented by Article II, § 2 which grants permission to Congress, to "vest the appointment of such inferior officers as they think proper, in the President alone, in the courts of law, or in the heads of departments."

Flexibility in the power of appointment has persisted to the present time. For example, in the event of a vacancy, a district court may appoint an acting United States Attorney, an executive officer, to serve until the President fills the office. 28 U.S.C. § 546 (1982).

The power of Congress to place appointive power in the District Court for the District of Columbia was upheld in *Hobson v. Hansen*, 265 F.Supp. 902 (D.D.C.1967) (three judge court). In that case the court cited the dual nature of the District of Columbia tribunal, which functions as the equivalent of a state court of general jurisdiction under Article I as well as an Article III federal court. The same characteristic was cited in *Palmore v. United States*, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973), which held that Congress could properly constitute Article I courts in the District of Columbia to try local criminal offenses. Congress however may not confer Article III powers on an Article I judge. For this reason in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the Court held that bankruptcy judges lacked the authority to adjudicate state common law actions.

A common thread running through the cases discussed thus far is the imposition of duties on the courts by Congress. Contrast that situation with the case at hand in which we review the activity of an Executive investigative-advisory commission that was authorized by Congress and to which the President has appointed members of the judiciary. Two factors are significant—the work of the Commission is nonjudicial and the service of the judges is voluntary. Neither the enabling statute nor the Executive Order mandates inclusion of judicial members.[3]

Case law in the mandatory extrajudicial service field is sparse but is virtually nonexistent in the voluntary service area. There is a lengthy historical practice of members of the Supreme Court and other federal judges serving on various nonjudicial governmental commissions.

---

cial acts for a department other than the one to which the concerned individual belongs—that the emphasis is on separation of institutions, not personnel. Under this theory, the doctrine does not affect informal and unofficial contacts which, however, can raise issues of judicial ethics, propriety, and conflict of interest. *See* Slonim, *Extrajudicial Activities and the Principle of the Separation of Powers*, 49 Conn.B.J. 391 (1975).

**3.** An example of Congressional direction that members of a Commission include judges is the "Sentencing Commission," 28 U.S.C.A. § 991–98 (1984). The statute reads in relevant part:

"(a) There is established as an independent commission in the judicial branch of the United States, a United States Sentencing Commission which shall consist of seven voting members and one nonvoting member. The President ... shall appoint the voting members of the Commission, by and with the advice and consent of the Senate.... At least three of the members shall be Federal judges in regular active service selected after considering a list of six judges recommended to the President by the Judicial Conference of the United States.

"(b) The purposes of the United States Sentencing Commission are to—

(1) establish sentencing policies and practices for the Federal criminal justice system...." 28 U.S.C. § 991 (1984).

John Jay served simultaneously as the first Chief Justice and Ambassador to England in 1794. A successor, Chief Justice Oliver Ellsworth was Minister to France during his term on the Court. John Marshall for a brief period was both Chief Justice and Secretary of State. Five Justices served on the Election Commission in 1877 that resolved the bitterly contested presidential election that year. A number of Justices have served on boards of arbitration to resolve boundary disputes and other claims with several countries [4] as well as various tribunals which devoted their attention to other governmental problems outside the courts. In more recent times, Justice Owen Roberts served on the Commission to investigate the disaster at Pearl Harbor. Justice Robert Jackson was a prosecutor at the Nuremberg war crimes trial, and Chief Justice Earl Warren presided over the Commission investigating the assassination of President Kennedy.

None of these activities was made the subject of litigation, but there has been a rising tide of criticism of judicial participation in such extrajudicial bodies. Responsible commentators have suggested that such conduct by judges violates the separation of powers. Chief Justice Stone declined President Roosevelt's request to serve on a commission investigating the rubber shortage during World War II. He wrote to the President on July 20, 1942 that in undertaking extrajudicial governmental assignments, a judge "'exposes himself to attack and indeed invites it, which because of his peculiar situation in-

evitably impairs his value as a judge and the appropriate influence of his office.'" Mason, *Extra-Judicial Work for Judges: The Views of Chief Justice Stone*, 67 Harv. L.Rev. 193, 204 (1953). Chief Justice Stone also refused an offer by President Truman of appointment to the Hague Arbitration.

When he was first approached and asked to participate on the Commission to Investigate President Kennedy's assassination, Chief Justice Warren declined. He explained,

"I told [Deputy Attorney General] Katzenbach and [Solicitor General] Cox that I had more than once expressed myself to that effect for several reasons. First, it is not in the spirit of constitutional separation of powers to have a member of the Supreme Court serve on a presidential commission; second, it would distract a Justice from the work of the Court, which had a heavy docket; and, third, it was impossible to foresee what litigation such a commission might spawn, with resulting disqualification of the Justice from sitting in such cases. I then told them that, historically, the acceptance of diplomatic post by Chief Justices Jay and Ellsworth, had not contributed to the welfare of the Court, that the service of five Justices on the Hayes-Tilden Commission had demeaned it, that the appointment of Justice Roberts as chairman to investigate the Pearl Harbor disaster had served no good purpose, and that the action of Justice Robert Jackson in leaving Court for a year to become

**4.** President Grant appointed Justice Nelson to represent the United States in arbitrating claims of Great Britain in 1871. Chief Justice Fuller and Justice Brewer accepted appointments as boundary arbitrators in a dispute between Venezuela and British Guiana. Justice Charles Evans Hughes served on a Commission to determine postal rates in 1911, and in 1930 undertook settlement of a border dispute between Guatemala and Honduras. Justice Day served on the American-German Claims Commission. The first Justice Harlan served as an arbitrator in the Fur Seal arbitration. Justice Roberts served on the Mexican Claim Commission, and Justice Van Devanter was an arbitrator in the controversy with Great Britain growing out of seizure of the ship "I'm Alone."

For other instances of participation by members of the judiciary in such activities, see Mason, *Extra-Judicial Work for Judges: The Views of Chief Justice Stone*, 67 Harv.L.Rev. 193 (1953). *See also* McKay, *The Judiciary and Nonjudicial Activities*, 35 Law & Contemp. Probs. 9 (1970); Slonim, *Extrajudicial Activities and the Principle of the Separation of Powers*, 49 Conn.B.J. 391 (1975); B. Murphy, The Brandeis/Frankfurter Connection, 345–63 (1982). S.Rep. No. 7, 80th Cong., 1st Sess. 1947; Nominations of Hon. Marvin Jones and Hon. John Caskie Collet, *reprinted in* Hearings of the Subcommittee on Separation of Powers, S.Rep. No. 1097, 91st Cong., 1st Sess. (1969).

chief prosecutor at Nurnberg after World War II had resulted in divisiveness and internal bitterness on the Court."

E. Warren, *The Memoirs of Chief Justice Earl Warren,* 356 (1977)

Despite these objections and his initial refusal to serve, the Chief Justice later yielded to the powerful personal persuasion of President Johnson and became Chairman of the Commission. His service, however, did indeed result in severe criticism.

It may be seen that in instances of voluntary assumption of extrajudicial duties the separation of powers challenge is not triggered by legislation or Executive Order, but rather by the judge's acceptance. Although there has been criticism of the executive and legislative branches for tendering the offer and appealing to the judge's patriotism,[5] nevertheless judicial assent is voluntary and consciously given. At some point, however, the question whether a judge's activity contravenes separation of powers will shade into an inquiry of standards of judicial conduct. Although those ethical considerations are of the highest importance, their violation will not necessarily implicate constitutional prohibitions.

The only case directly on point is *Scaduto,* 763 F.2d 1191 (11th Cir.1985), a decision by a divided panel of the Court of Appeals for the Eleventh Circuit. The movant in that case objected to a subpoena issued by the Commission. The court upheld the issuance of the subpoena but declared that the composition of the Commission violated the separation of powers principle.

The majority reasoned that "[i]mpartiality is one of the central, constitutionally-ordained, requirements of the federal judicial office." Service on the Commission requires the adoption of a "pro-government perspective which is ill-suited" to the neutrality required of a judge. Even if, in fact, the judge could maintain his objectivity in carrying out his courtroom duties, the question remained whether litigants "could

sustain equal faith in his impartiality." 763 F.2d at 1197. The majority accordingly concluded that "the conferral of such powers on federal judges violates the separation of powers." *Id.* at 1198.

In his concurrence, Judge Roney pointed out that the members of the Commission were not required to serve but did so voluntarily. He also referred to the history of judges serving on advisory commissions, and their frequent appearances as witnesses testifying on matters of judicial administration before congressional committees.

We believe that Judge Roney's approach is more appropriate in analyzing the constitutional issue. The *Scaduto* majority found objectionable the "conferring" of powers on a judge that might lead to questions of his impartiality. But we think it more accurate to focus on the voluntary acceptance of that authority by judicial officers. The attention should be on the judge's conduct and not that of those who tendered, but did not impose, the powers.

We may not overlook *Ferreira,* where the Supreme Court concluded that although the district judge, as such, could not perform administrative work at the behest of the executive department, yet that same individual could properly do so by assuming the role of a commissioner.

We are not prepared to say that the Constitution prohibits the service of Article III judges on any and all extrajudicial governmental committees or commissions. In the field of judicial administration, for instance, judges possess special knowledge. To put aside that expertise when legislation is being considered would be wasteful and counter-productive. As noted earlier, the Constitution does not contemplate that the three branches of government shall exist in hermetically-sealed compartments, uncooperative with, and oblivious to the activities of the others. The people of this country would be ill-served by such an unrealistic dogma. The protection from abuse of pow-

---

5. *See* Hearings before the Subcommittee on Separation of Powers, S.Rep. No. 1097, 91st Cong., 1st Sess. (1969).

er which the separation concept seeks to provide is not compromised by a necessary degree of cooperation between the three branches.[6] *See Nixon v. Administrator of General Services,* 433 U.S. at 443, 97 S.Ct. at 2790 (where the Court termed "archaic" the view that "the separation of powers requir[es] three airtight departments of government.").

We assume, without deciding, that under some circumstances judges may violate the principle of separation of powers by voluntarily undertaking nonjudicial activity which intrudes substantially in the domain of another branch or so weakens their ability to function as Article III judges that the courts are substantially hindered in the proper performance of their duties. In this analysis, however, care must be taken not to confuse ethical considerations and accepted notions of propriety in judicial conduct with constitutional imperatives.

Drawing the line between the two concepts is a difficult task, one which is often performed in the absence of controlling precedent. That the separation of powers principle and standards of proper conduct for judges are frequently confused is vividly illustrated by the extensive hearings in the Senate in 1969. The Senate Judiciary Subcommittee on Separation of Powers convened to hear testimony from retired Supreme Court Justices, retired and active federal judges, academics, senators, and members of the legal community.

In addition to conflicting views on whether judges should serve on governmental commissions, there was spirited discussion on disciplinary sanctions as well as such matters as the propriety of judges teaching in law schools, lecturing on matters of public interest, holding press conferences, and making financial disclosures. Clearly, some of those subjects had no relationship to the separation of powers doctrine, except in the backhanded way that congressional action on some of the subjects might well constitute intrusion on the independence of the judiciary. *See Nonjudicial Activities of Supreme Court Justices and other Federal Judges, Hearings before the Subcommittee on Separation of Powers,* S.Rep. No. 1097, 91st Cong., 1st Sess. (1969).

Although a number of thoughtful comments were received at the hearings, little attention appears to have been given to the distinction between judicial activities which were forbidden by the Constitution and those which were merely undesirable from the standpoint of public perceptions of the courts. A fair reading of the record does show that most of the witnesses and correspondents disapproved of judges undertaking such assignments as the Warren and Pearl Harbor Commissions as well as the Nuremberg trials. There was strong support for judges participating in such areas as judicial administration, rule-making, and similar matters closely related to the courts. Indiscriminate references were made to separation of powers, judicial independence, and canons of ethics as sources of concern.

The 1969 hearings was not the first time that extrajudicial service by federal judges has encountered congressional criticism. In 1947, the Senate Judiciary Committee concluded that,

"The practice of using federal judges for nonjudicial activities is undesirable. The practice holds great danger of working a diminution of the prestige of the judiciary. It is a determent (sic) to the proper functioning of the judicial branch of the government.

"The Committee is not now disposed to recommend legislative action. It be-

---

**6.** At its meeting on September 17, 1985, the Judicial Conference of the United States approved a committee recommendation that the Sentencing Commission legislation be amended to permit federal judges to serve in its activity on a part-time basis. At the same meeting, the Conference disapproved a pending bill which would have established a judicial panel to study the need for federal legislation on product liability. The objection cited was the inappropriateness of interjecting the Conference into a policy area considered to be reserved for Congress.

Report of the Proceedings of the Judicial Conference of the United States, pp. 52, 60 (Sept. 17–18, 1985).

lieves the remedy lies in the first instance, in the good sense and discretion of the Chief Executive. His is the prime initiative in the matter of these appointments and that is the point where the independence of the judges and the prestive (sic) of the judiciary may best be preserved."

S.Rep. No. 7, 80th Cong., 1st Sess., Nominations of Honorable Marvin Jones and Honorable John Caskey Collot, 1947, *reprinted in* Hearings *supra* at 791.

It must be emphasized that it is not our task to determine whether judicial membership on the Commission is undesirable or violative of judicial standards of conduct.[7]

Although Scarfo urges such contentions on us, only the issue of separation of powers, not that of judicial impropriety, is before the court. The Commission as an entity, not the judges, is the party to this litigation.

Finding no more specific authority on the issue, we turn to the functional analysis set out in *Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). We must determine whether judicial membership on a commission prevents it from carrying out executive duties, and whether participation by the judges will disrupt the operation of the courts. We answer each question negatively and will discuss our responses separately.

### A.

The Commission is charged with investigating and submitting a report on organized crime to the President. We find no reason to believe that because some members of the Commission are judges, the Commission will be prevented from performing its functions. As Judge Roney wrote, "the judges do not wear their robes in the Commission room." 763 F.2d at 1204. Their presence does not prevent the Commission from conducting hearings and preparing a report as well as making recommendations for legislation.

The Commission does not prosecute, does not indict, and does not legislate. The President's authority to constitute the Commission is founded on the Federal Advisory Committee Act, 5 U.S.C. §§ 1–15 (1982), Appendix 2:

"Unless otherwise specifically provided by statute or Presidential directive, advisory committees shall be utilized solely for advisory functions. Determinations of action to be taken and policy to be expressed with respect to matters upon which an advisory committee reports or makes recommendations shall be made solely by the President or an officer of the Federal Government."

5 U.S.C. § 9(b), App. 2.

The powers given by specific legislation to the Commission include the power to subpoena, but with enforcement reserved to the courts, and authority to examine

---

**7.** Comment G to Canon 5 of the Code of Judicial Conduct for federal judges reads:

"*Extra-Judicial Appointments.* A judge should not accept appointment to a governmental committee, commission, or other position that is concerned with issues of fact or policy on matters other than the improvement of the law, the legal system, or the administration of justice, unless appointment of a judge is required by Act of Congress. A judge should not, in any event, accept such an appointment if his governmental duties would interfere with the performance of his judicial duties or tend to undermine the public confidence in the integrity, impartiality, or independence of the judiciary....

"Valuable services have been rendered in the past to the states and the nation by judges appointed by the executive to undertake important extra-judicial assignments. The appropriateness of conferring these assignments on judges must be reassessed, however, in light of the demands on judicial manpower created by today's crowded dockets and the need to protect the courts from involvement in extra-judicial matters that may prove to be controversial....

"[I]t is hardly the function of a Code of Judicial Conduct to compel judges to refuse, without careful regard to the circumstances, tasks Congress has seen fit to authorize as appropriate in the public interest. Accordingly, although legislatively prescribed extra-judicial assignments should be discouraged, where Congress requires the appointment of a judge to perform extra-judicial duties, the judge may accept the appointment provided that his services would not interfere with the performance of his judicial responsibilities' or tend to undermine public confidence in the judiciary."

records, including wiretaps ordinarily reserved to certain members of the Executive Branch. That a member of the Commission is a judge does not inhibit the use of these powers or excuse the duty to submit an advisory report. The ability to make findings and recommendations would be the same in the absence of a judge's participation.

### B.

The inquiry into the second part of the functional analysis is more difficult. The *Scaduto* court concluded that the Commission activity was detrimental to the notion of judicial impartiality, a "central, constitutionally-ordained requirement of the federal judicial office." Impartiality is indeed basic to the notion of a proper functioning judiciary but is not a matter confined to Article III judges. It applies equally to Article I and state judges even though they are not subject to Article III's inhibitions. *See Ferreira; Hobson v. Hanson.* Although the misgivings about the appearance of impartiality would apply to the appointment of Article I judges to a governmental commission, an Article III separation of powers issue would not be presented in that instance.

In the case at hand, since there is no proof of lack of impartiality, what is challenged is the appearance of bias. Scarfo contends that service on the Commission brands a judge as pro prosecution, particularly in cases which may be said to have some connection with organized crime. This argument is troubling but does not persuade us that the Constitution has been violated. Rather we conclude that it may be addressed in specific cases by a motion for recusal.

Judge Kaufman is not serving on the Commission as a representative or member of any court, and does not purport to act on behalf of the judiciary or any court. The appearance of bias which may result from his service on the Commission does not disable any other Article III judge or any court from performing properly assigned duties. In the event of recusals there will be a substitution of Article III judges and the work of the courts will not be impaired.

The disqualifications might impose some hardship on other judges who would be required to hear the cases when a former commission member recuses, but realistically what may be expected is the substitution of another kind of case for the ones requiring disqualification. What is present here is a limited dislocation and not one which would require reassignment of a large number of cases. In the courts of appeals, there are ample provisions for the creation of panels and in banc courts such that the temporary disability of an active judge would not prevent disposition of an appeal. Since no active member of the Supreme Court is a member of the Commission, we need not be concerned here with the effect of recusals on the ability of the Court to decide cases when the outcome is close.

Scarfo further argues that work on the Commission necessarily consumes a substantial amount of judicial time. The record before us, however, does not provide any information as to the extent to which the operation of the Court of Appeals for the Second Circuit was or will be impaired as result of Judge Kaufman's attention to Commission business. The prejudice to the court's functions would have to be substantial, and it is difficult in these circumstances to conclude that the temporary absence of one judge would have a major impact on the functioning of the court as a whole. Again, this argument goes to the issue of desirability and fairness to the other judges who must bear an extra load. It does not, however, rise to the stature of an obstacle impeding the courts' ability to discharge their Article III obligations.

██ In short, we do not find that the presence of a retired Justice and an active circuit judge on the Commission constitutes a substantial impairment of the functions of the Article III courts. Because that test is met, we need not consider the additional question—whether such a compelling need exists as would justify the extrajudicial service.

Accordingly, the order of the district court will be vacated and the case will be remanded with instructions to enforce the Commission's subpoena.