**UNITED STATES of America, Plaintiff,**

**v.**

**Antonio Jose FRANCO, alias Antonio Rivera, Roque Marmolejos, Alfredo Lopez, Defendants.**

**Crim. A. No. 87–44.**

United States District Court,
E.D. Kentucky,
at Lexington.

May 26, 1988.

---

Jane E. Graham, Trial Atty., U.S. Atty's. Office, Lexington, Ky., for plaintiff.

Fred Peters, Lexington, Ky., for Antonio Jose Franco.

Donald D. Waggener, Lexington, Ky., for Roque Marmolejos.

Benjamin Hicks, Lexington, Ky., for Alfredo Lopez.

## MEMORANDUM OPINION AND ORDER

WILHOIT, District Judge.

On March 21, 1988, the defendant Antonio Jose Franco was sentenced to 189 months in prison. On the same date the defendant Roque Marmolejos was sentenced to 151 months imprisonment and the defendant Alfredo Lopez was sentenced to 161 months. All three defendants were found guilty on Counts I and II of the indictment. Their sentences are to run concurrently. The defendants were sentenced under the Sentencing Guidelines promulgated by the United States Sentencing Commission. 28 U.S.C. Section 991 *et seq.* Currently before the Court is defendant Franco's Motion to Declare Sentencing Guidelines Promulgated by the United States Sentencing Commission Invalid. That motion has been adopted by defendants Marmolejos and Lopez.

The defendants argue that the application of the newly effective guidelines is violative of their rights in several ways.

[1.] The guidelines have been promulgated pursuant to an unconstitutional delegation of power by Congress.

[2.] The Sentencing Commission itself is an unconstitutional entity which violates the separation of powers.

■ The guidelines offend due process because they unduly restrict the availability of probation in violation of the law.

■ The criminal history guidelines violate due process because increments in the point scale for a defendant's prior record are based on past sentencing practices that the Sentencing Reform Act specifically intends to eradicate.

Each of these contentions shall be considered in turn after a brief description of the United States Sentencing Commission, its mandate under 28 U.S.C. Section 991 *et seq.*, and the results of that mandate.

The United States Sentencing Commission was established as a result of the Comprehensive Crime Control Act of 1984. Comprehensive Crime Control Act of 1984, Section 217, Pub.L. No. 98–473, 98 Stat.

1976. (Chapter II of this Act was codified as 28 U.S.C. Sections 991–98 which may also be cited as the Sentencing Reform Act of 1984.) The purposes of the Commission are twofold. First, the Commission is to establish federal criminal sentencing policies and practices that serve the specific penological aims of adequately punishing, deterring, and rehabilitating the criminal while protecting the public. (*See* 18 U.S.C. Section 3553(a)(2).) These aims are to be achieved with certainty, uniformity, and flexibility based on "state-of-the-art" behavioral concepts. Second, the Commission is to develop a means of evaluating the effectiveness of the achievement of the specific penological aims.

The Sentencing Commission's membership is to be knowledgeable, broadly based, and politically balanced. There are seven voting members of the Commission. At least three of the members are to be federal judges. The other four members are to be appointed, with the advice and consent of the Senate, from among persons recommended by leaders in such fields as law enforcement, defense, and prosecution. No more than four of the Commissioners can be members of the same political party. The Attorney General is to sit on the Commission in a nonvoting ex-officio capacity.

The duties of the Commission include promulgating guidelines to be used by sentencing courts in imposing criminal sentences and issuing policy statements regarding the guidelines and the achievement of the specific penological aims. The Commission is also to periodically review and revise the guidelines.

1. Delegation of power argument.

■ Franco's first line of attack on the validity of the new guidelines is his assertion that the guidelines were promulgated pursuant to an unconstitutional delegation of power by Congress. Franco relies essentially on *A.L.A. Schechter Poultry v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), and *Panama Refining Company v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), to support his position that even if Congress could delegate its authority to promulgate the new guidelines, the delegation in this instance is too broad to pass constitutional muster.

For a better perspective on the Supreme Court's historical analysis and treatment of legislation that has been challenged on the grounds that it violated the delegation of powers doctrine, the Court is guided by *United States v. Arnold*, 678 F.Supp. 1463 (S.D.Cal.1988), wherein United States District Judge Rudi M. Brewster stated as follows:

Only twice has the Supreme Court struck down a statute by reason of undue delegation of legislative power. For an historical summary, see *Synar v. United States*, 626 F.Supp. 1374, 1383 (D.D.C.), *aff'd on other grounds sub nom., Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). Both cases were decided during a period of unusual conflict between the Court and the Roosevelt-dominated Congress. Both cases struck down portions of the National Industrial Recovery Act of 1933. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). Since then, the Court has not invalidated a statute under the delegation doctrine. *Synar*, 626 F.Supp. at 1383 & n. 9. This unswerving rejection of delegation challenges indicates a great deal of deference to Congress' power to delegate. *Id.* at 1384.

In view of this historical deference, the district court should not expand the delegation doctrine beyond the scope of *Schechter Poultry* or *Panama Refining*. Moreover, the Supreme Court usually analyzes challenges under the delegation doctrine by comparing delegations previously adjudicated. *Synar*, 626 F.Supp. at 1384–85. Thus, the facts of *Schechter Poultry* and *Panama Refining* provide a useful starting point for the analysis.

*Schechter Poultry* concerned a statute that permitted members of an industry to propose, and the President to approve, "codes of fair competition" for that industry. Congress neglected to define "fair

competition" in any way, leaving it to industry and the President to codify any measures that "may tend to effectuate" such broad goals as increased industrial utilization, increased consumption, reduced unemployment, improved standards of labor, and conservation of natural resources. *Schechter*, 295 U.S. at 534–35, 55 S.Ct. at 845. Indeed, the purposes of the statute resemble an economist's formulation for an utopian society. The Court understandably held that the statute's "wish list" of permissible goals did not provide adequate standards to guide industry or the President. *Id.* at 541–42, 55 S.Ct. at 848.

*Panama Refining* also dealt with a delegation challenge to the National Industrial Recovery Act. The section there under attack authorized the President to make illegal any shipments of petroleum or petroleum products produced or withdrawn from storage in excess of the amount permitted by state authority. *Panama Refining*, 293 U.S. at 414–15, 55 S.Ct. at 245–46. The statute failed to set forth any policy or rules to guide state officials in their determinations of what production should be permitted. Nor did the statute establish any criteria to govern the President's discretion. *Id.* at 415, 55 S.Ct. at 246. The Court struck down that section of the National Industrial Recovery Act because "it gives to the President an unlimited authority to determine the policy and to lay down the prohibition, or not lay it down, as he may see fit." *Id.*

The contrast between these cases and the Sentencing Act is manifest. The Act does not increase the existing delegation of sentencing authority. Before the Act, the courts were constrained to sentence within the maximum and minimum, if any, set out in each criminal statute. The Act does not permit the Commission to ignore these existing sentencing limits or authorize any punishment that was not possible before the Act. *Compare United States v. Robel*, 389 U.S. 258, 273–75, 88 S.Ct. 419, 428–29, 19 L.Ed.2d 508 (1967) (Brennan, J. concurring). This aspect alone distinguishes the Act from

the broad conferrals of lawmaking power struck down in *Schechter Poultry* and *Panama Refining*.

Within these limits, the Act also provides clear policy statements and specific directives to guide the Commission in exercising the delegated rulemaking authority. The Act sets forth the following "intelligible principles" to orient the Commission: (1) punish in accordance with the four recognized purposes of criminal law—punishment, deterrence, protection, and rehabilitation; (2) eliminate sentencing disparities as between similarly situated defendants; and (3) maintain sufficient flexibility to accommodate mitigating or aggravating circumstances in individual cases. 28 U.S. C. § 991(b)(1).

*United States v. Arnold*, at 1467–68.

By reason of the foregoing analysis, Judge Brewster concluded that the enabling act for the mandatory sentencing Guidelines "provides ample statements of policy and specific rules to guide the Commission's exercise of the delegated authority." *Id.* at 1468. He held that the act does not constitute an invalid delegation of legislative power.

Although Judge Brewster went on to hold that the Guidelines were invalid because the Commission's composition violates the doctrine of separation of powers (the Court shall address this argument *infra*), this Court finds most instructive his decision that the enabling act under which the Guidelines were promulgated did not abridge the delegation of powers doctrine.

The Court must also point out that when Franco argued his motion to declare the Guidelines unconstitutional, his counsel conceded that his delegation of powers argument is weak.

Subsequent to *Schechter Poultry* and *Panama Refining*, during the course of the past fifty years, the Supreme Court has had several occasions to review other legislation and to determine whether it violated the delegation of powers doctrine. The Supreme Court's measuring stick against which questioned legislation is compared

seems to be found in *Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), wherein the Court reiterated its previous test for constitutionality, as follows:

> If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power.

*Id.* at 342, 94 S.Ct. at 1150.

In the half-century after *Schechter Poultry* and *Panama Refining*, numerous other legislative delegations have withstood judicial scrutiny. For example, *Lichter v. United States*, 334 U.S. 742, 785–86, 68 S.Ct. 1294, 1316–17, 92 L.Ed. 1694 (1948) (delegating enactment of standards "permitting recovery of excessive profits"); *Federal Power Com'n v. Hope Natural Gas Co.*, 320 U.S. 591, 600, 64 S.Ct. 281, 286, 88 L.Ed. 333 (1944) (permitting Commission to fix "just and reasonable" rates for natural gas); *Nat'l Broadcasting Co. v. United States*, 319 U.S. 190, 225–26, 63 S.Ct. 997, 1013, 87 L.Ed. 1344 (1943) (permitting licensing of radio communications "as public interest, convenience, or necessity [requires]"); and *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 397, 60 S.Ct. 907, 914, 84 L.Ed. 1263 (1940) (authorizing establishment of maximum price of coal "when in the public interest").

Consequently, in light of the foregoing history and analysis, and controlling precedent, this Court holds that the enabling act does not violate the delegation of powers doctrine.

2. Separation of powers argument.

This challenge to the composition of the Commission is threefold. It is argued that the judicial members of the Commission are engaged in legislative activities in establishing the sentencing guidelines; that this legislative/judicial commission is unduly controlled by the executive branch; and that this commission is acting as an unauthorized Article III appellate court.

Before considering these specific challenges, it is useful to describe the manner in which sentencing occurred prior to the promulgation of the Commission's guidelines. Both before and after the creation of the Commission, Congress legislatively establishes certain activities as criminal and determines the penalties for engaging in such conduct. These penalties generally include at least a maximum penalty. For example the sentence prescribed in 21 U.S. C. Section 841(b)(1)(A) under which the defendants were convicted is:

> a term of imprisonment which may not be less than 10 years or more than life ... a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $4,000,000 if the defendant is an individual.... Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this subparagraph. No person sentenced under this subparagraph shall be eligible for parole during the term of imprisonment imposed therein.

Before the guidelines, once the jury had determined that a person was guilty of a specific crime, the sentencing judge pronounced a sentence up to the maximum allowable or within the prescribed range. *See United States v. Grayson*, 438 U.S. 41, 45–46, 98 S.Ct. 2610, 2613, 57 L.Ed.2d 582 (1978). Unless statutorily prohibited, the sentencing judge could pronounce a penalty of probation instead of imprisonment or he could elect to impose a split sentence of imprisonment and probation. In assessing the proper sentence, the judge had available as a reliable resource a presentence report prepared by a probation officer. Probation officers are part of the judicial branch of the government. *See Burns v. United States*, 287 U.S. 216, 220, 53 S.Ct. 154, 155, 77 L.Ed. 266 (1932). Once the convicted person began serving his/her sentence, the actual amount of time served was determined by the United States Parole Board, which is a branch of the Executive Department. *See Hyser v. Reed*, 318 F.2d 225, 233–35 (D.C.Cir.1963). Actual sentence determination thus was a hybrid process created by legislative edict, judicial

discretion, and executive fiat. *See Williams v. New York*, 337 U.S. 241, 248, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949).

In considering the challenge that the Commission violates the principle of separation of powers, it is necessary initially to make clear that there is no distinct, sharply defined separation of powers in the United States Government as established by the Constitution. As the Supreme Court reaffirmed in *Nixon v. Administrator of General Services*, 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1976):

> In designing the structure of our Government and dividing and allocating the sovereign power among three co-equal branches, the Framers of the Constitution sought to provide a comprehensive system, *but the separate powers were not intended to operate with absolute independence.*

Citing *United States v. Nixon*, 418 U.S. 683, 707, 94 S.Ct. 3090, 3107, 41 L.Ed.2d 1039 (1974) (emphasis supplied in 433 U.S. at 443, 97 S.Ct. at 2790). Under this "pragmatic, flexible approach," *id.* at 442, 97 S.Ct. at 2789, the test to be applied in determining whether the principle of separation of powers has been transgressed is based on practical workings rather than on political theory or pure definition. As the Court elucidated in *Nixon,*

> in determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents ... [another] Branch from accomplishing its constitutionally assigned functions.... Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress.

433 U.S. at 443, 97 S.Ct. at 2790.

■ The first challenge to the principle of separation of powers is two-pronged. The defendants indicate that this independent body within the judiciary is "legislating" (or "executing," according to the government) laws and that Article III judges may not participate in such a non-ju-dicial activity. In the above exposition, the Court has already dealt, in part, with the contention that the primary activity of the Commission is so "legislative" as to be undelegable. Also, to paraphrase the observation of the Court of Appeals, Eleventh Circuit, in considering a separation of powers challenge to the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980, "We know of no authority for the proposition that courts' [sentencing actions] are to be labelled as 'executive' simply because non-adjudicative in character." *In the Matter of Certain Complaints Under Investigation*, 783 F.2d 1488, 1504 (11th Cir.1986). In *Ex parte United States*, 242 U.S. 27, 42, 37 S.Ct. 72, 74, 61 L.Ed. 129 (1916), the Supreme Court, in recognizing the plenary power of Congress to grant wide judicial discretion in sentencing, also found that this power "includes the right in advance to bring within judicial discretion for the purpose of executing the statute elements of consideration which would be otherwise beyond the scope of judicial authority." Essentially the Commission is engaged in this discretionary function under strict, specific Congressional guidance. The enabling act states that the Commission, in constructing the guidelines, should impose sentences in which:

> If a sentence specified by the guidelines includes a term of imprisonment, the maximum of the range established for such a term shall not exceed the minimum of that range by more than the greater of 25 percent or 6 months, except that, if the minimum term of the range is 30 years or more, the maximum may be life imprisonment.

28 U.S.C. Section 994(b)(2). These instructions are formalized in the Sentencing Table, United States Sentencing Commission, *Guidelines Manual*, Chapter 5 at 5.2. The enabling act states that the Commission shall ensure that certain impermissible factors—such as "race, origin, creed, and socioeconomic status"—are not included in sentencing decisions. 28 U.S.C. Section 994(d). The guidelines at Chapter 5, Section 5H1.10, contain the policy statement that "Race, Sex, National Origin, Creed, Religion and Socio–Economic Status" "are

not relevant in the determination of a sentence" and thus should not be considered as reasons for departure from the mandated penalty. Chapter 1, Part A, 4(b) at 1.6. The authority and scope of the Commission's work is not so creative or discretionary as to be properly labeled "legislative."

As the Third Circuit Court of Appeals stated, in considering a separation of powers challenge to the service of one sitting judge and one retired justice on the President's Commission on Organized Crime,

> Separation of powers questions are relatively uncomplicated when they involve institutions within the three branches of government. Analysis is more complex when the issue centers on the conduct of individuals holding office within those branches.

*In the Matter of the President's Com'n on Organized Crime (Scarfo )*, 783 F.2d 370, 375 (3d Cir.1986). It is recognized that judges can constitutionally engage in rule or policy making tasks that are directly related to their primary judicial function. Such permissible tasks, which cannot be specifically labeled "case or controversy" determinative, include writing the rules of civil and criminal procedure and participating in the federal Judicial Conference or Judicial Council. *See* 28 U.S.C. Section 2072; 18 U.S.C. Sections 3771–72; 28 U.S. C. Sections 331–32; *Sibbach v. Wilson & Company*, 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941); *Chandler v. Judicial Council*, 398 U.S. 74, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970). The concept of a judge acting as a "commissioner" rather than a court is illuminated in *United States v. Ferreira*, 54 U.S. (13 How.) 40, 47, 14 L.Ed. 40 (1851). *See also Scarfo*, 783 F.2d at 375. Indeed, judges because they are judges often serve in various completely non-judicial positions, such as Chief Justice Earl Warren's chairmanship of the Warren Commission.

Essentially the Commission is merely rationalizing and unifying what was previously the work of divers individual judges and parole commissioners. Congress, in viewing the end product of the former sentencing process, apparently concluded that a hydra-headed monster had evolved—bred from judicial discretion, or indiscretion, and parole convolutions. *See* S.Rep. No. 225, 98th Cong., 2nd Sess. 46–49 (1983), U.S. Code Cong. & Admin.News 1984 pp. 3182, 3229–3232. Almost two decades ago the Attica Commission, in investigating the causes of that 1971 prison uprising, found that "the most urgent inmate grievances were not about prison conditions.... The most persistent complaints were about unequal treatment in the sentencing process and in the parole process." McKay, *It's Time to Rehabilitate the Sentencing Process*, 60 Judicature 223, 226 (1976). The conclusion of the former chairman of the New York State Special Commission on Attica five years after the uprising and more than a decade from today was:

> Society has generally failed to determine on a rational and defensible basis what punishment is appropriate to the severity of the offense and for the individual offender. That failure is the most serious injustice inherent in the criminal justice system in the United States.

*Id.* The establishment of the Sentencing Commission and the attendant abolition of the United States Parole Commission are to engender an effective, fair sentencing system—in large part by curbing judicial sentencing discretion (use of the guidelines is mandatory) and establishing "real" sentences (what you get is what you serve; much less "good time" and no parole). *See Guidelines Manual*, Chapter 1, Part A, 3. at 1.2–1.4.

The United States Sentencing Commission, having statutorily absorbed the wide discretion formerly granted to each individual judge and the various members of the parole board, issued guidelines based on that collective wisdom that aim to rationalize and standardize sentencing so that similar conduct by persons with similar criminal backgrounds and similar mitigating circumstances would be penalized in a similar manner. As the Court of Appeals noted in *Scarfo* at 378:

> We are not prepared to say that the Constitution prohibits the service of Article III judges on any and all extrajudicial governmental committees or commis-

sions. In the field of judicial administration, for instance, judges possess special knowledge. To put aside that expertise when legislation is being considered would be wasteful and counter-productive.

All sentences are still to remain within the limits statutorily defined by Congress.

The traditional function of judges in criminal cases has been to pronounce a sentence within certain legislatively predetermined limits. This function continues but the result is made fairer and more uniform by the application of the guidelines. Congress could have chosen to promote uniformity by narrowing the designated sentence for each crime. Instead, determined that "sentencing should remain primarily a judicial function," S.Rep. No. 225, 98th Cong., 2nd Sess. 159 (1983), U.S. Code Cong. & Admin.News 1984, p. 3342, it chose to have that narrowing process done uniformly by experts in the field functioning as "an independent commission in the judicial branch." 28 U.S.C. Section 991(a). The factors written into the guidelines are merely a restatement of the same factors that every individual judge considered previously. Each branch continues to carry out its traditional functions with even less potential for disruption. The application of the grid comes closer to fulfilling the just objectives of Congress than does a myriad of inchoate, diversely biased sentences dispersed at all levels under the maximum. In that the application of the guidelines is mandatory, service on the Commission should not have a disruptive impact on a judge/commissioner. Judge/commissioners would merely traverse the same sentencing path as the rest of the judiciary or detours could be accomplished via reassignments or recusals. See *Scarfo*, 783 F.2d at 381. (This situation does not present the possibility for bias discussed by the court in *In re Application of the President's Commission on Organized Crime*, 763 F.2d 1191, 1197 (11th Cir.1985).) Certainly, having sentence determination under the wing of the judicial branch has less potential for the disruption of justice than having sentences determined by the same branch that prosecutes those serving the sentences.

The second separation of powers argument posed by the defendants is that the Sentencing Commission is excessively controlled by the executive branch. This control is said to stem primarily from the fact that the "Chairman and members of the Commission shall be subject to removal from the Commission by the President only for neglect of duty or malfeasance in office or for other good cause shown." 28 U.S.C. Section 991(a).

A close reading of the subsection from which this removal provision is drawn indicates that this power is to be interpreted very narrowly. The Commission is denoted as an "independent commission." Appointments are to be made by the President only after consulting with a broad spectrum of people and only with the advice and consent of the Senate. The selection of the Chairman also necessitates the advice and consent of the Senate. No more than four members of the Commission may be members of the same party. The President's representative, the Attorney General, cannot vote. The whole structure and composition of the Commission underlines the initial statement that an *independent* commission is established. Furthermore removal is to be "only" for certain reasons. Clearly "only" limits "for other good cause shown" as well as "for neglect of duty or malfeasance." This Court agrees with the amicus curiae brief submitted by the Sentencing Commission which views this provision as merely a necessary means of "personnel management."

The defendants' reliance on *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), is not well taken. In that case the Supreme Court found part of the Gramm–Rudman–Hollings Act violative of separation of power. The Comptroller General, who had executory functions under the Act, was deemed to be subservient to Congress. As the Court noted, "Congress could simply remove, or threaten to remove, an officer for executing the laws in any fashion found to be unsatisfactory to Congress." *Id.* at 726, 106 S.Ct. at

3189. The language in the Sentencing Reform Act of 1984 does not allow such sweeping authority. It is closer to the removal power granted to the President in regard to members of the Federal Trade Commission. The Court's findings concerning the FTC in *Humphrey's Executor v. United States*, 295 U.S. 602, 628, 55 S.Ct. 869, 874, 79 L.Ed. 1611 (1935), would apply equally to the Sentencing Commission: the commission "cannot in any proper sense be characterized as an arm or an eye of the executive. Its duties are performed without executive leave and, in the contemplation of the statute, must be free from executive control."

■■■ The defendants' final separation of powers argument is that the Commission invalidly acts as an Article III appellate court in reviewing the guidelines. Section 994(s) of the Act states:

> (s) The Commission shall give due consideration to any petition filed by a defendant requesting modification of the guidelines utilized in the sentencing of such defendant, on the basis of changed circumstances unrelated to the defendant, including changes in
>
> (1) the community view of the gravity of the offense;
>
> (2) the public concern generated by the offense; and
>
> (3) the deterrent effect particular sentences may have on the commission of the offense by others.
>
> Within one hundred and eighty days of the filing of such petition the Commission shall provide written notice to the defendant whether or not it has approved the petition. If the petition is disapproved the written notice shall contain the reasons for such disapproval. The Commission shall submit to the Congress at least annually an analysis of such written notices.

This subsection is obviously included to render assistance to the Commission in its ongoing mission as well as to provide flexibility in regard to changing circumstances. As the subsection now stands it merely indicates that convicted persons can have some input into future modifications of the guidelines. There is no indication of whether or in what manner approval of a petition will affect the sentence of the petitioner. *See United States v. Ruiz–Villanueva*, 680 F.Supp. 1411, at 1425, n. 8 (S.D.Cal.1988), for an assessment of the meaning of this subsection. Thus this Court cannot say that this provision is unconstitutional on its face. In that the defendants have not actually petitioned the Commission in regard to the specified factors, they lack standing to challenge the application of the provision.

3. and 4. Due process arguments.

The defendants challenge specific provisions of the guidelines as denying due process. One assertion is that the guidelines unduly restrict the availability of probation; the second claim is that the use of a defendant's prior record in determining a sentence taints the "new" philosophy the guidelines are intended to fulfill. The defendants lack standing to challenge either of these provisions. As the Supreme Court stated in *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1978),

> The constitutional limits on standing eliminate claims in which the plaintiff has failed to make out a case or controversy between himself and the defendant. In order to satisfy Art. III, the plaintiff must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.

■■■ The statute under which Franco, Marmolejos, and Lopez were sentenced specifically states that probation is not available. The mandate of 21 U.S.C. Section 841(b)(1)(A) is: "Notwithstanding any other provision of law, *the court shall not* place on probation or suspend the sentence of any person sentenced under this subparagraph." (Emphasis added.) Therefore the unavailability of probation stems from an explicit Congressional determination and not from any application of the guidelines.

■■■ Also in that none of these defendants had a prior criminal conviction that resulted in the assessment of any points

under the Criminal History Category, *Guidelines Manual*, Chapter 4, Part A, Section 4A1.1, a challenge to that chapter is inappropriate. The enabling act under which the guidelines were promulgated, however, specifically directs that past criminal activity be considered by the Commission and that the impact of such activity be toward "a substantial term of imprisonment." 28 U.S.C. Section 994(i). *See also* Section 994(h).

The Court, being sufficiently advised, IT IS HEREIN ORDERED that:

(1) Antonio Jose Franco's Motion to Declare Sentencing Guidelines Promulgated by the United States Sentencing Commission Invalid is DENIED;

(2) Roque Marmolejos' Motion to Declare Sentencing Guidelines Promulgated by the United States Sentencing Commission Invalid is DENIED;

(3) Alfredo Lopez' Motion to Declare Sentencing Guidelines Promulgated by the United States Sentencing Commission Invalid is DENIED.