UNITED STATES of America, Plaintiff,

v.

Anthony J. TOLBERT, Defendant,

**The United States Sentencing Commission, Amicus Curiae.**

No. 87–10091–01.

United States District Court, D. Kansas.

April 8, 1988.

---

Richard K. Willard, Asst. U.S. Atty. Gen., Robert Cynkar, Deputy Asst. U.S. Atty. Gen., Washington, D.C., Benjamin L. Burgess, Jr., U.S. Atty. for Kan., Robin Fowler, Asst. U.S. Atty. for Kan., Wichita, Kan., for plaintiff.

Charles D. Anderson, Federal Public Defender, Marilyn M. Trubey, Asst. Federal Public Defender, Wichita, Kan., Alan Morrison, of Public Citizens Litigation Group, Washington, D.C., for defendant.

## MEMORANDUM AND DECISION

PATRICK F. KELLY, District Judge.

On November 9, 1987, defendant Anthony J. Tolbert was charged by Information with the commission of a felony in violation of 18 U.S.C. § 472, which is alleged to have occurred on or about November 6, 1987.

On November 30, 1987, defendant and his counsel, the Assistant Federal Public Defender for the District of Kansas, appeared before me, at which time I accepted his plea of guilty and entered an order in connection therewith.

Given that circumstance, I directed the commencement of the presentence process pursuant to the newly enacted and effective sentencing guidelines authorized by the Sentencing Reform Act of 1984, and suspended the matter for sentencing.

Inasmuch as defendant Tolbert's case presents a first experience here, I have looked forward to the entire remaining process with a sense of anticipation. Here, I will finally experience firsthand the inner workings of the guidelines, and I will hopefully develop a modest "comfort" level in connection therewith. I say this here because, notwithstanding the considerable study and conferences taken up in advance of this moment, engagement of the sentencing guidelines appears to be an exercise of confusion, if not frustration. They are extremely complex and complicated. I say this without apology, as I am not alone.

I have anticipated firsthand experience with the sentencing guidelines for another reason—curiosity. My own review convinces me that the traditional role of the sentencing judge is to be dramatically restricted. Even so, I am ready to apply the guidelines. In this regard, whether we like it or not, each of us is duty-sworn to carry out the law faithfully—as we always have —and will.

As to the exercise of this important, lonely, and grim judicial function, however, regardless of the rather rigid requisites seemingly imposed, each of us will continue to address each case on its own merit, each one deserving of quiet, objective and fair reflection. To this extent, nothing will change, as nothing about these guidelines can *ever* change the sworn duties of the Article III trial judge in the exercise of this important function.

Now, perhaps to no one's surprise, the defendant has moved for an order declaring the Sentencing Reform Act unconstitutional, and to sentence him pursuant to the

law which existed prior to November 1, 1987. I say I am not surprised, because the constitutional issues are being raised across the country. I have at hand the opinions entered to date,[1] including that of my colleague, the Honorable John Kane, finding the Act unconstitutional. *United States v. Smith*, No. 87–CR–374, slip op. (D.Col. Mar. 25, 1988). These opinions, while diverse in their analyses and conclusions, have been useful in considering the issues now before me.

On receipt of defendant's brief, I put in place a briefing schedule. The United States has fully responded; additionally, the Sentencing Commission has entered its appearance *amicus curiae* and has responded and argued here. Defendant has replied to all briefs. Counsel for the Public Citizen Litigation Group has additionally entered an appearance for defendant and has also participated in argument. To be sure, the issues have been fully researched and reviewed.

On April 8, 1988, I took up a lively and provocative hearing, at which time all issues were fully argued. Here, defendant contends essentially as follows:

The Sentencing Reform Act of 1984 is unconstitutional because (1) Congress failed to provide the commission with the proper framework for exercising its delegated power, in violation of the delegation doctrine; and (2) Congress improperly placed the commission in the judicial branch, gave the President removal power over the commission, and mandated that three Article III judges serve on the commission, all in violation of separation of powers principles. Each of these contentions will be considered in turn.

## I. *Sentencing Reform Act*

Before discussing the challenges to the Sentencing Reform Act made by defendant, I will first briefly discuss the history of the Act, the purposes and composition of the commission, and the guidelines promulgated by the commission. In doing so, however, I am mindful that the parties to this action are quite familiar with the background of the Act and its "real-life" implications. Further, those courts which have previously considered the Act's constitutionality have also considered its background in some detail, and it need not be repeated in full here.

In 1984, Congress enacted the Comprehensive Crime Control Act, Pub.L. 98–473, 98 Stat. 1837. Title II of that Act, the Sentencing Reform Act of 1984 (the "Act") (codified at 28 U.S.C. § 991–98), effected a comprehensive revision to federal sentencing law. The Sentencing Reform Act grew, at least in part, out of Congress' belief that "Federal judges mete out an unjustifiably wide range of sentences to offenders with similar histories, convicted of similar crimes, committed under similar circumstances." S.Rep. No. 225, 98th Cong., 1st Sess. 38 (1983) ("S.Rep."), *reprinted in* 1984 U.S.Code Cong. & Admin. News 3182, 3221. Congress concluded that this alleged disparity in sentencing could be "traced directly to the unfettered discretion the law confers on those judges and parole authorities responsible for imposing and implementing the sentence." S.Rep. at 38, 1984, U.S.Code Cong. & Admin.News 3221.

Congress sought to solve these perceived problems by establishing "as an independent commission in the judicial branch of

---

1. *See, e.g., United States v. Estrada,* 680 F.Supp. 1312 (D.Minn.1988) (guidelines violate separation of powers but are severable from other sections of Sentencing Reform Act); *United States v. Frank,* 682 F.Supp. 815 (W.D.Pa.1988) (sentencing guidelines are unconstitutional as violative of the due process clause and the Act violates separation of powers); *United States v. Erves,* No. CR–87–478A, slip op. (N.D.Ga. Mar. 22, 1988) (unconstitutional designation of commission as judicial agency is severable from remainder of Act; guidelines are constitutional); *United States v. Chambless,* 680 F.Supp. 793 (E.D.La. 1988) (Act is constitutional); *United States v. Ruiz–Villanueva,* 680 F.Supp. 1411 (S.D.Cal.1988) (Act is constitutional); *United States v. Lopez– Barron,* No. 87–1309–K (S.D.Cal. Feb. 26, 1988) (sentencing guidelines are unconstitutional); *United States v. Manley,* No. 87–1290–R–CRIM, slip op. (S.D.Cal. Feb. 18, 1988) (sentencing guidelines are invalid); *United States v. Arnold,* 678 F.Supp. 1463 (S.D.Cal.1988) (guidelines are invalid; composition of commission and placement in judicial branch violate separation of powers).

the United States a United States Sentencing Commission...." 28 U.S.C. § 991(a).

The commission consists of seven voting members and one nonvoting member. The President appoints the voting members, at least three of whom must be federal judges. The three judges are selected from a list of six judges recommended to the President by the Judicial Conference of the United States.[2] The commissioners are subject to removal by the President for "neglect of duty or malfeasance in office or for other good cause shown." 28 U.S.C. § 991.

Congress delegated to the Sentencing Commission (or "commission") the responsibility for establishing sentencing policies and practices that "assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2) of title 18, of the United States Code." 28 U.S.C. § 991(b)(1)(A). 18 U.S.C. § 3553(a)(2) defines the purposes of sentencing as deterrence of criminal conduct, protection of the public from further crimes, rehabilitation of the defendant and punishment of the defendant commensurate with the seriousness of the offense.

The commission is also directed to provide "certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors...." 28 U.S.C. § 991(b)(1)(B).

These purposes are to be met by the commission through the promulgation of sentencing guidelines "for use of a sentencing court in determining the sentence to be imposed in a criminal case...." 28 U.S.C. § 994(a)(1). The guidelines are to control the sentencing court's determination as to (1) whether to impose probation, a fine or imprisonment; (2) the appropriate amount of a fine or length of probation or imprisonment; (3) whether a defendant sentenced to imprisonment should be placed on a term of supervised release after imprisonment; and (4) whether multiple sentences to a term of imprisonment should run concurrently or consecutively. 28 U.S.C. § 994(a)(1)(A), (B), (C) & (D).

The guidelines promulgated by the commission are to establish a "sentencing range" for each category of offense involving each category of defendant. 28 U.S.C. § 994(b)(1). In any sentencing range established for a term of imprisonment, the maximum of the range is not to exceed the minimum of the range by more than 25% or six months, whichever is greater. 28 U.S. C. § 994(b)(2). In establishing the categories of offenses and defendants, Congress directed the commission to take into account a number of factors, where relevant. 28 U.S.C. § 994(c) & (d).

Pursuant to these instructions, the commission established a complex point system and "matrix" whereby the sentencing range for each defendant is determined by the intersection of the offense level and the criminal history category.

Following the effective date of the guidelines (Nov. 1, 1987), sentencing courts are *required* to impose a sentence of the kind, and within the range specified by the guidelines unless the court finds that an aggravating or mitigating circumstance exists that was not adequately taken into consideration by the commission in formulating the guidelines. 18 U.S.C. § 3553(b). Further, if a sentencing judge does depart from the guidelines, the judge must state in open court the basis for the departure.

## II.  *Delegation of Power*

The defendant initially contends the Sentencing Reform Act is unconstitutional because Congress failed to adequately confine the commission's exercise of the power delegated to it by Congress.

Article I, Section 1, of the United States Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States...." Congress is authorized under Article I, Section 8, "[t]o make all Laws which shall be necessary and proper for carrying into Execu-

---

2.  Three circuit judges currently serve on the commission. They are Judge William W. Wilkins, Jr., Chairman (4th Cir.); Judge Stephen G. Breyer (1st Cir.); and Sr. Judge George E. MacKinnon (D.C.Cir.)

tion" its general power. The Supreme Court has held Congress "is not permitted to abdicate or transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529, 55 S.Ct. 837, 79 L.Ed. 1570 (1935). This limitation upon Congress' ability to delegate its legislative power is known as the "delegation doctrine". *See* Schoenbrod, *The Delegation Doctrine: Could the Court Give It Substance?*, 83 Mich.L.Rev. 1223, 1224 (1985).

The Supreme Court has long attempted to "draw the line" between those functions or powers which the legislature can delegate, and those which it cannot. As Chief Justice Marshall stated in *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43, 6 L.Ed. 253 (1825):

> The line has not been exactly drawn which separates those important subjects, which must be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions to fill up the details.

The test which the court has applied in determining whether the legislature has improperly delegated its power was succinctly stated in *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed.2d 624 (1928), as follows:

> If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power.

This "intelligible principle" standard has guided the court in resolving numerous delegation doctrine cases, and with the exception of two cases in 1935[3], the court has consistently rejected delegation challenges. *See, e.g., United States v. Mazurie*, 419 U.S. 544, 556–57, 95 S.Ct. 710, 717, 42 L.Ed. 2d 706 (1975) (upheld Congress' delegation of authority to Indian reservation's tribal council to regulate the distribution of alcoholic beverages); *Lichter v. United States*, 334 U.S. 742, 774–75, 68 S.Ct. 1294, 1311, 92 L.Ed. 1694 (1948) (upheld delegation in War Contracts Renegotiation Act of duty to determine whether contract will yield "excessive profits"); *Yakus v. United States*, 321 U.S. 414, 426, 64 S.Ct. 660, 668, 88 L.Ed. 834 (1944) (upheld delegation under the Emergency Price Control Act for the fixing of maximum prices of commodities during wartime emergency).

While the "intelligible principle" standard has been criticized for permitting Congress to "avoid hard choices" and for allowing agencies to resolve conflicts among congressional goals (*see* Schoenbrod, *supra*, at 1225), I recognize that it is the standard which must be applied in resolving defendant's delegation challenge in this case. However, before considering the application of the "intelligible principle" test in this case, I would first briefly digress to discuss an issue not specifically raised by defendant here—that being whether Congress may delegate in the first instance its authority to prescribe punishment for criminal offenses. In this, I am in agreement with those who suggest the power exercised by the Sentencing Commission intrudes into an area where decisions should be made through the "deliberative processes of Congress." *See* Liman, *The Constitutional Infirmities of the United States Sentencing Commission*, 96 Yale L.J. 1363, 1374 (1987). *But cf. Synar v. United States*, 626 F.Supp. 1374, 1385 (D.D.C.1986), *aff'd on other grounds sub nom., Bowsher v. Synar*, 478 U.S. 714, 106

---

**3.** In *A.L.A. Schnechter Poultry Corp. v. U.S.*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, the Court struck down § 3 of the National Industrial Recovery (NIRA), which permitted the President to approve and prescribe "codes of fair compettion" in a number of industries and trades. The Court found that the legislature had violated the delegation doctrine by giving the President virtually "unfettered" discretion in approving or prescribing codes. 295 U.S. at 541–42, 55 S.Ct. at 848. In *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), the Court found unconstitutional § 7 of the NIRA —a statute which authorized the President to prohibit the transportation in interstate and foreign commerce of certain petroleum products. The Court held this section to be an unconstitutional delegation of legislative power because Congress "has declared no policy, has established no standard, has laid down no rule." 293 U.S. at 430, 55 S.Ct. at 252.

S.Ct. 3181, 92 L.Ed.2d 583 (1986) (rejecting the argument that the legislature cannot delegate certain "core functions").

The establishment of criminal penalties and fines has always been considered a legislative function. *See, e.g., Whalen v. United States,* 445 U.S. 684, 689, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715 (1980) (power to define criminal offenses and to prescribe the punishments to be imposed resides wholly in the legislature); *United States v. Evans,* 333 U.S. 483, 486, 68 S.Ct. 634, 636, 92 L.Ed. 823 (1948) (defining crimes and fixing penalties are legislative functions); *Ex Parte U.S.,* 242 U.S. 27, 42, 37 S.Ct. 72, 74, 61 L.Ed. 129 (1916) (while the right to try offenses and impose punishment is judicial, the authority to define and fix the punishment for crime is legislative); *United States v. Sharpnack,* 355 U.S. 286, 297–98, 78 S.Ct. 291, 298, 2 L.Ed.2d 282 (1958) (Douglas, J., dissenting) ("The power to make laws under which men are punished for crimes calls for ... the exercise of legislative judgment.").

Despite the fact that the establishment of penalties and fines is clearly a legislative function, Congress has chosen to delegate that authority to a commission. I do not believe it was contemplated by our founders that we would be governed by a commission—yet the action taken by Congress in formulating a sentencing commission creates just such a precedent. In my view, this should not stand. Simply said, Congress can no more appoint an unelected commission to initiate, write and thereafter monitor the sentencing laws of this nation than I can appoint a similarly facilitated commission to decide this case! By establishing the United States Sentencing Commission, Congress has avoided making difficult "choices" (some of which were addressed by me in the course of argument), and permitted an unelected body to resolve conflicting goals.

Accordingly, I would concur with those who contend the delegation doctrine should be revived, and a standard derived which would not permit Congress to confer power which is "legislative" in character to agencies or commissions. *See* Schoenbrod, *supra,* at 1251, and Liman, *supra,* at 1369 n. 53.

With that said, the court now examines the delegation made to the Sentencing Commission for the purpose of determining whether Congress adequately confined the exercise of the commission's discretion.

In addition to the directives already discussed, the Sentencing Reform Act contains a number of instructions to guide the commission in establishing sentencing guidelines. For instance, Congress directed the commission to utilize a two-dimensional matrix which takes into account various categories of offenses as well as categories of defendants. 28 U.S.C. § 994(c). Congress also specified a number of factors the commission was to consider in categorizing offenses, including the circumstances under which the crime is committed, the nature and degree of harm it caused, the community view of its gravity, and the deterrent effect a particular sentence would have upon the commission of the offense by others. 28 U.S.C. § 994(c)(1)–(c)(7). Additionally, the commission is ordered to assure that the guidelines, in recommending a length or term of imprisonment, reflect the "general inappropriateness" of considering the defendant's education, vocational skills, employment record, family ties and responsibilities, and community ties, and to create neutral guidelines with respect to race, sex, national origin, creed, and socio-economic status of offenders. 28 U.S.C. § 994(d) & (e).

Finally, Congress directed the commission to require a term of imprisonment "at or near the maximum authorized" where the offense was a crime of violence or was one of several drug-related crimes, and the offender had been previously convicted of two or more similar felonies. 28 U.S.C. § 994(h). For a number of other specified crimes, Congress required the commission to establish a "substantial term of imprisonment." 28 U.S.C. § 994(i).

■ When these and other instructions provided by Congress in the Sentencing Reform Act are considered in their entirety, it appears Congress met its responsibility of providing an "intelligible principle" to which the commission was required to conform. Accordingly, the court finds (albeit with some resignation) that the Sentencing

Reform Act does not constitute an unconstitutional delegation of power.

### III. *Separation of Powers*

The framers of the Constitution, by dividing the new federal government into three categories—legislative, executive, and judicial—attempted to assure that each branch of government would confine itself to its assigned responsibility. *I.N.S. v. Chadha,* 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983). While this constitutional separation of powers often produces conflicts and confusion, "it was deliberately so structured to assure full, vigorous and open debate on the great issues affecting the people and to provide avenues for the operation of checks on the exercise of governmental power." *Bowsher v. Synar,* 478 U.S. 714, ——, 106 S.Ct. 3181, 3187, 92 L.Ed.2d 583, 594 (1986).

Consistent with these principles, Article III, Section 2, of the Constitution limits the judiciary's function to the consideration of "cases" or "controversies". These terms have been defined by the Supreme Court to mean "the claims of litigants brought before the courts for determination by such regular proceedings as are established by law or custom for the protection or enforcement of rights, or the prevention, redress, or punishment of wrongs." *Muskrat v. United States,* 219 U.S. 346, 357, 31 S.Ct. 250, 254, 55 L.Ed.2d 246 (1911).

### A. *Placement of Commission Within Judicial Branch*

■ Despite this limitation on the powers of the judicial branch, Congress made the Sentencing Commission an "independent" commission within the judicial branch. 28 U.S.C. § 991(a). Defendant argues the placement of the commission within the judiciary violates separation of powers because the commission has the power to issue substantive sentencing guidelines —a function defendant contends is clearly beyond the scope of the judiciary's limited authority to determine "cases" and "controversies". I agree.

The District of Columbia Circuit Court of Appeals recently considered the limited function of the judiciary in *In re Sealed Case,* 838 F.2d 476 (D.C.Cir.1988), *prob. juris. noted,* —— U.S. ——, 108 S.Ct. 1010, 98 L.Ed.2d 976, a case considering the constitutionality of the Ethics in Government Act of 1978 and its provisions for the employment of independent counsel. One of the challenges made to the Act was that it unconstitutionally vested the "Special court", an Article III court, with non-Article III powers. The D.C. Circuit agreed, and found the Act improperly permitted an Article III court to appoint independent counsel, receive reports from independent counsel, and terminate the office of independent counsel on its own motion. In considering the Act's "inattention" to Article III limitations, the court wrote:

> Intimate involvement of an Article III court in the supervision and control of a prosecutorial office undermines the status of the judiciary as a neutral forum for the resolution of disputes between citizens and their government. From the inception of this nation the crucial importance of a neutral judiciary has been repeatedly emphasized. Madison wrote, concerning the dangers of mixing the judicial function with other governmental roles, " '[w]ere the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary controul, for *the judge* would then be *the legislator.* Were it joined to the executive power, *the judge* might behave with all the violence of *an oppressor.*' " THE FEDERALIST No. 47, at 326 (J. Madison) (J. Cooke ed. 1962) (emphasis in original) (quoting Montesquieu). Of the three branches, it is the role of the judiciary that the Constitution most clearly and tightly confines within narrow borders.... This careful delineation of the Judicial Branch's appropriate role serves both to guard against the danger of judicial tyranny feared by Madison and to preserve the courts as a neutral forum for the resolution of disputes. "Judicial adherence to the doctrine of the separation of powers preserves the courts for the decision of issues, between litigants, capable of effective determination."

838 F.2d at 516 (citation omitted).

Just as the creation of an Article III special court with executive powers under-

mines the status of the judiciary, so does the placement in the judicial branch of a commission with the power to issue *substantive* sentencing guidelines. The Supreme Court has recognized that while Congress may delegate to the federal courts the authority to make rules, the rules must be procedural rather than substantive in nature. *See Sibbach v. Wilson & Co.*, 312 U.S. 1, 14, 61 S.Ct. 422, 426, 85 L.Ed. 479 (1941).

The fact that the sentencing guidelines in this case are substantive in nature was recently confirmed by the Supreme Court in *Miller v. Florida*, ––– U.S. –––, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987). In *Miller*, the Supreme Court considered a constitutional *ex post facto* challenge to a Florida statute establishing revised sentencing guidelines.[4] The State of Florida argued, *inter alia*, that the statutory guidelines could not violate the *ex post facto* clause of the Constitution because the revised sentencing law constituted "merely a procedural change." ––– U.S. at –––, 107 S.Ct. at 2451, 96 L.Ed.2d at 360. The United States Supreme Court disagreed, noting that while "the distinction between substance and procedure might sometimes prove elusive," the revised guidelines in issue were substantive in nature. ––– U.S. at –––, 107 S.Ct. at 2453, 96 L.Ed.2d at 362. The Court reasoned that the guidelines did not simply provide procedural "guideposts" for use in the exercise of the judge's discretion, but rather, they created *"a high hurdle that must be cleared before discretion can be exercised...."* ––– U.S. at –––, 107 S.Ct. at 2453–54, 96 L.Ed.2d at 363.

Similarly, the sentencing guidelines promulgated by the United States Sentencing Commission place rigid restrictions upon the discretion of the sentencing judge. A judge may depart from the guidelines *only* if he finds aggravating or mitigating circumstances exist which were not taken into account by the commission in formulating the guidelines. As such, the guidelines are clearly substantive in nature.

The government, in its reply brief, concedes that the sentencing guidelines are substantive and points out that if the guidelines were mere procedural rules, they "would be limited to such matters as directing the manner in which material relevant for sentencing would be filed, and the process by which a sentence would be issued." Instead, the government notes, the sentencing guidelines virtually mandate that a judge impose a specified sentence within a circumscribed range of choices. (Gov.Brief, p. 27.)

Despite its concession that the sentencing guidelines are substantive in nature, and as such are impermissibly promulgated by a commission within the judicial branch, the government urges this court to disregard the commission's statutory designation as a judicial entity and find, instead, that the commission comports with constitutional requirements because it performs "executive functions." I am not so inclined.

The language used by Congress in placing the commission in the judicial branch is clear. Further, Congress intended the location of the commission to be in the judiciary, as is evidenced by the Senate report on the legislation establishing the commission. In addition to stating Congress' intent to place the commission in the judicial branch, the Senate report cites "the Committee's strong feeling that, even under this legislation, sentencing should remain primarily a judicial function." S.Rep. No. 225, 98th Cong., 1st Sess. 159 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin. News 3182, 3342.

Further, while federal statutes are to be construed as to avoid serious doubts of their constitutionality, "this canon of con-

---

**4.** Florida's sentencing guidelines establish a presumptive sentencing range within which the sentencing judge has unreviewable discretion to fix the defendant's sentence. At the time Miller was convicted, the statute provided a presumptive range of 3½ to 4½ years imprisonment. However, the sentencing guidelines were subsequently revised and by the time Miller was sentenced the guidelines called for a presumptive sentence of 5½ to 7 years in prison. The Supreme Court found the sentencing guidelines statute, as applied to Miller, violated the *ex post facto* clause of the Federal Constitution (Art. I, § 10, Cl. 1). ––– U.S. at –––, 107 S.Ct. at 2453, 96 L.Ed.2d at 363.

struction does not give a court the prerogative to ignore the legislative will in order to avoid constitutional adjudication." *Commodity Futures Trading Comm. v. Schor*, 478 U.S. 833, ——, 106 S.Ct. 3245, 3252, 92 L.Ed.2d 675, 686 (1986). Therefore, I decline to rewrite the Sentencing Reform Act in order to place the commission within the executive branch.

A further problem with the placement of the commission in the judicial branch is the continuing control of the commission by the President. Each of the commissioners is appointed by the President and the President also has the power to reappoint the commissioners as their terms expire. More importantly, the President can "remove commissioners for neglect of duty or malfeasance in office or for other good cause shown." 28 U.S.C. § 991(a).

Defendant argues the President's continuing control over the commission presents the same type of "inter-branch interference" the Supreme Court found unconstitutional in *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). In *Bowsher*, the Court found unconstitutional the provision of the Gramm–Rudman Act assigning to the Comptroller General the duty of reporting to the President regarding the spending reductions needed to reduce the federal deficit to a targeted amount. While the powers assigned to the Comptroller General under § 251 of the Act were executive in nature, he was removable only by Congress. The Court thus found that Congress had retained control over the execution of the Act in violation of the doctrine of separation of powers. 478 U.S. at ——, 106 S.Ct. at 2193, 92 L.Ed.2d at 602. *See also In re Sealed Case*, 838 F.2d at 496–97 n. 36 ("[T]he issue here is the mirror image of that in *Bowsher*, because the removal restrictions grant the independent counsel a 'here-and-now' *freedom* from supervision and control by the President inconsistent with the constitutional doctrine of a unitary executive.").

The commission contends this case is distinguishable from *Bowsher* because the President is able to remove commissioners only for neglect of duty, malfeasance, or "good cause shown". Thus, the commission argues the President does not actually execute "control" over the commission.

Contrary to the commission's contention, the statutory bases for removal in *Bowsher* were very similar to those in the instant case. Specifically, in *Bowsher* Congress had the power to remove the Comptroller General for permanent disability, inefficiency, neglect of duty, malfeasance, or a felony involving moral turpitude. 478 U.S. at ——, 106 S.Ct. at 3189, 92 L.Ed.2d at 597. Thus, the commission's argument lacks merit.

Accordingly, I find the placement of the Sentencing Commission in the judicial branch violates separation of powers principles because it gives the judiciary substantive rulemaking ability beyond its limited authority to determine "cases" and "controversies". Further, the Act improperly gives the President removal power over the commissioners in violation of the principles enunciated in *Bowsher*.

### B. *Composition of Commission*

Even if the placement of the commission in the judicial branch did not render the Act unconstitutional, the composition of the commission is also problematic from a separation of powers perspective.

In establishing the Sentencing Commission, Congress mandated that the President select three Article III judges from a list of six nominated by the Judicial Conference to serve on the commission. 28 U.S.C. § 991(a). Defendant argues this requirement violates separation of powers principles because it requires Article III judges to exercise powers traditionally associated with other branches of government.

The government contends the three judges appointed to the commission serve "voluntarily" and in their individual capacities, and the fact that the three commissioners "happen to be judges" is of no consequence in considering a separation of powers challenge. Further, the government points out that historically judges have served in executive branch offices,[5]

---

**5.** For instance, John Jay served simultaneously as the first Chief Justice and Ambassador to England in 1794 while John Marshall, for a

and the practice must, therefore, be accorded substantial weight. Neither of these contentions withstand scrutiny.

First, the service of three judges can hardly be declared "voluntary" where the enabling statute *requires* the appointment and participation of three Article III judges. Without the judges, there would be no commission. Moreover, the judges were appointed to the commission not because of their status as individuals, but *because* they are judges. The government's reliance on historical practice must also fail. As one commentator has noted, "the practice of judges performing extrajudicial activities is not nearly as 'unbroken' and 'systematic' as would be necessary to support the implication of the constitutional norm." Liman, *supra*, at 1383. It is also worth noting that today, such "historical practice" would "likely be considered a violation of the Code of Judicial Conduct for United States Judges." THE FEDERAL JUDICIAL CENTER, *Seminar for Newly Appointed United States District Judges*, p. 20 (West Publishing Co. 1977) (comments of Hon. James Lawrence King).

There are few decisions considering the constitutionality or propriety of extrajudicial service on governmental commissions. However, two recent circuit court decisions considering constitutional challenges to the President's Organized Crime Commission provide this court with some direction.

In *Application of President's Comm. on Organized Crime (Scaduto)*, 763 F.2d 1191 (11th Cir.1985), the Eleventh Circuit held the inclusion of federal judges as members of the President's Commission on Organized Crime [6] violated separation of powers. The court reasoned as follows:

> Impartiality is one of the central, constitutionally-ordained, requirements of the federal judicial office, and this impartiality is threatened by many of the activities of the Commission. A judge who is charged with assisting and improving en-

forcement efforts against organized crime must adopt a pro-government perspective which is ill-suited to his obligation to be neutral in the courtroom. The kind of information he might uncover through the investigatory activities of the Commission would further endanger his impartiality.... Moreover, even if a judge could satisfy himself that he could separate his participation on the Commission from his judicial functions, it is not clear that litigants could sustain equal faith in his impartiality.

763 F.2d at 1197 (citation omitted).

However, in *Matter of President's Comm. on Organized Crime Subpoena of Scarfo*, 783 F.2d 370 (3d Cir.1986), the Third Circuit considered the same constitutional challenge and determined the presence of judges on the commission did not violate separation of powers principles. In so holding, the court focused primarily on the voluntary nature of the judges' service on the commission, and the determination that the judicial membership on the commission did not prevent the commission from carrying out its duties or disrupt operation of the courts.

Of particular importance to our analysis here, however, is the Third Circuit's distinction of the facts before it from situations in which Congress *imposed* extrajudicial duties on the courts. 783 F.2d at 376. As an example of such nonvoluntary service, the Third Circuit cited the Sentencing Reform Act and Congress' requirement that three members of the Sentencing Commission be Article III judges. 783 F.2d at 376 n. 3. This crucial distinction renders the Third Circuit's conclusion in *Scarfo* unpersuasive in this case. Moreover, *Scarfo* can also be distinguished from this case because the duties of the Commission on Organized Crime were to investigate and submit a report on organized crime to the President. As noted by the Third Circuit,

brief period, was both Chief Justice and Secretary of State. Justice Robert Jackson served as prosecutor at the Nuremburg War Crimes Tribunal and Chief Justice Earl Warren presided over the commission which investigated President Kennedy's assassination. *See Liman, supra*, at 1382 nn. 137–38; *Matter of President's*

*Comm. on Organized Crime*, 783 F.2d 370, 377 (3d Cir.1986).

**6.** The commission's 19 members included a retired Supreme Court justice and an active Circuit Court judge.

"the Commission [on Organized Crime] does not prosecute, does not indict, and does not legislate." 783 F.2d at 380. In contrast, the duties of the Sentencing Commission include establishing narrow guidelines which all sentencing judges are required to utilize, and from which deviations are allowed in very few circumstances.

While the Third and Eleventh Circuits reached opposite conclusions regarding the propriety of extrajudicial service on commissions, both courts applied the same test in analyzing the separation of powers challenge. Specifically, both courts applied the "impairment of function" test set forth by the United States Supreme Court in *Nixon v. Adm'r of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). Under that test, the court must determine first whether action by one branch of government has the potential to prevent the affected branch from accomplishing its constitutionally-assigned functions. If the potential for disruption is present, the court must then consider whether the "impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." 433 U.S. at 443, 97 S.Ct. at 2790.

■ Application of the functional standard in this case leads to the conclusion that the appointment of three judges to the Sentencing Commission potentially impairs the proper functioning of the judiciary, and is not justified by any overriding need.

First, the placement of judges on the Sentencing Commission threatens the impartiality of judges on the commission as well as other federal judges. This is true primarily because the judges' participation on the Sentencing Commission gives the guidelines promulgated by the commission a "presumptive legality" or "stamp of approval" that they might not otherwise have. *See* Comment, *Separation of Powers and Judicial Service on Presidential Commissions*, 53 U. of Chicago L.Rev. 993, 1013 (1986).

The government contends any "appearance of impropriety" or partiality can be remedied by the recusal of individual judges from cases challenging or related to the sentencing guidelines.

The disqualification or recusal of individual judges, however, will not alleviate the effect the judges' service on the commission has on the impartiality of other judges. As pointed out by one commentator, the judges who are most likely to be appointed to presidential commissions are often those who are the most highly respected and influential. Thus, the appointment of such judges to the commission may have a subtle effect upon other judges whose task it is to consider the work product of the commission. Comment, *supra*, at pp. 1013–14. *See also United States v. Estrada*, 680 F.Supp. 1312, 1335 (D.Minn.1988).

■ Lastly, in my view, service by *any* Article III judge on *any* commission, whose duty it is to legislate, offends Article III of the Constitution, and I am frankly at a loss to understand how any judge can so acquiesce. I say this with no disrespect to those colleagues who have accepted the role here and who indeed have so faithfully performed. However, when we accept the President's appointment to office, secure the Senate's consent, and take the oath of office, we willingly assume an entirely new and lonely role. Our role is distinct from all others; we are now judges; our sole responsibility is clear. We are to judge the cases, and in my view, no more is expected or contemplated of us. Because of our experience, we probably can, when asked, consult or lend advice. Surely, however, under no circumstance can we, or should we, be expected to write the very law we are expected to exercise. Thus, if for no other reason, I find the assignment of Article III judges to the Sentencing Commission to be an unconstitutional act of Congress and the Sentencing Reform Act a nullity.

In view of my holding today, I need not consider the defendant's additional contention that the sentencing guidelines issued by the commission are inconsistent with their enabling act.

■ Further, I will deny defendant's request to submit a supplemental brief on the issue of whether any unconstitutional provisions of the Sentencing Reform Act may be severed from the remainder of the stat-

ute. I have held the Act is unconstitutional because the composition of the commission and its placement in the judicial branch violate separation of powers principles. Thus, the guidelines promulgated by the commission are invalid. In this regard, I am in agreement with my colleague, Judge Rudi Brewster, who noted that because the sentencing guidelines were promulgated by a constitutionally flawed commission, they must be rendered invalid. *United States v. Arnold,* 678 F.Supp. 1463, 1472 (S.D.Cal. 1988). Therefore, the defendant here will be sentenced as if his criminal conduct occurred prior to the effective date of the guidelines, November 1, 1987.

IT IS ACCORDINGLY ORDERED this 8th day of April, 1988, that defendant's motion to declare the Sentencing Reform Act unconstitutional is granted. The sentencing guidelines promulgated by the United States Sentencing Commission are therefore found to be invalid and the defendant will be sentenced in accordance with the law as it existed prior to November 1, 1987.