UNITED STATES of America, Plaintiff,

v.

Lydia MENDEZ, Defendant.

No. 88 Cr. 78 (MBM).

United States District Court,
S.D. New York.

June 16, 1988.

Martin Klotz, Asst. U.S. Atty., New York City, for plaintiff.

Ruth Chamberlin, The Legal Aid Society, Federal Defender's Services Unit, New York City, for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

Lydia Mendez, guilty on her own plea of escaping in December 1987 from a community treatment center where she was serving a sentence for narcotics-related offenses, in violation of 18 U.S.C. § 751(a), challenges the validity of the Sentencing Guidelines which, by statute, govern all conduct in violation of federal criminal law occurring on or after November 1, 1987. She is not alone, nor am I. At least 140 district judges have been asked in over 100 cases to pass on the validity of the guidelines. Of these, at least 87 judges have found the guidelines unconstitutional; the remainder have upheld them.

As set forth succinctly in *United States v. Olivencia*, 689 F.Supp. 1319 (S.D.N.Y. 1988) (Leisure, J.), these holdings vary not only in result but also in reasoning. Thus the guidelines have been found inherently to deny due process by denying to a defendant the right to challenge the significance of facts relating to his crime or his

background, to violate the principle of separation of powers, and to constitute an overly broad delegation of legislative power to prescribe punishment. *Olivencia, supra,* at 3–6; *see also, United States v. Brodie,* 686 F.Supp. 941 (D.D.C.1988) (invalidating the guidelines on all three grounds).

Conversely, as reported by Judge Leisure in *Olivencia, supra,* at 6–8, the guidelines have been upheld as the result of a proper exercise of an executive function *United States v. Chambless,* 680 F.Supp. 793 (E.D.La.1988), and as the product of a judicial function, *United States v. Ruiz–Villeneuva,* 680 F.Supp. 4 (S.D.Cal. 1988). The Justice Department ("DOJ") asks that they be upheld on the former ground, the Guidelines Commission (the "Commission") on the latter. A survey of the results thus far calls to mind nothing so strongly as the band of blind men describing the elephant variously as a wall, a tree or a rope, depending on which part of the beast they touched.

Notwithstanding the diversity of the results, there has been remarkable unanimity in these opinions that the sooner the propriety of the guidelines is settled at the appellate level, the better. *Compare Olivencia, supra,* 2–3 (guidelines held unconstitutional), *with, United States v. Lopez,* 684 F.Supp. 1506, 1519–20, (C.D.Cal.1988) (*en banc*) (voting to uphold guidelines). In apparent accord with that view, the Supreme Court on June 13, 1988 took the extraordinary step of directing a writ of *certiorari* to the United States Court of Appeals for the Eighth Circuit in *United States v. Mistretta,* before the Eighth Circuit had conducted intermediate appellate review, the case to be heard at the Court's next term. *See, United States v. Johnson,* 682 F.Supp. 1033 (W.D.Mo.1988), *cert. granted sub nom. United States v. Mistretta,* —— U.S. ——, 108 S.Ct. 2818, 100 L.Ed.2d 920.

Thus, numerous judges have already explored the issues raised by the guidelines and many more may do so by the time their validity is ultimately determined by the Supreme Court. Therefore, there is even less reason in this case than in most others engaging issues that can be settled only by appellate courts, for a trial judge to indulge the conceit that something he may say might figure in the ultimate outcome. Nonetheless, it is of the essence of this office not simply to reach a result but to explain and justify it. *See, Brown v. Allen,* 344 U.S. 443, 496–97, 73 S.Ct. 397, 440–41, 97 L.Ed. 469 (1953) (separate opinion of Frankfurter, J.); *Nemmers v. United States,* 795 F.2d 628, 634–35 (7th Cir. 1986). Hence this opinion.

I.

A. *History and Background*

The Sentencing Reform Act of 1984 (the "Act") was passed as Chapter II of the Comprehensive Crime Control Act of 1984, but has a history very much its own.

"In the early days of the Republic * * * the period of incarceration was generally prescribed with specificity by the legislature." *United States v. Grayson,* 438 U.S. 41, 45, 98 S.Ct. 2610, 2613, 57 L.Ed.2d 582 (1978), but this system generated criticism of "excessive rigidity" in sentencing. *Id.* at 45, 98 S.Ct. at 2613 (citation omitted). Accordingly, fixed sentences were abandoned in favor of permitting the sentencing judge "to consider aggravating and mitigating circumstances surrounding an offense, and, on that basis, to select a sentence within a *range* defined by the legislature." *Id.* at 45–46, 98 S.Ct. at 2613 (emphasis in original).

The modern view as of the late Nineteenth Century was that trained correctional specialists should be permitted "to set the release date of prisoners according to informed judgments concerning their potential for, or actual, rehabilitation and their likely recidivism." *Id.* In 1910, Congress established the United States Parole Board to "administer the parole system as a part of the program to rehabilitate federal prisoners and restore them to useful membership in society." *Hyser v. Reed,* 318 F.2d 225, 233 (D.C.Cir.1963) (*en banc*). The result was indeterminate sentences set

by judges, with the release date set by the Parole Board, reflecting the "modern [as of 1949] philosophy of penology that the punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949).

However, the perception then arose that the discretion of judges to impose any sentence within statutory limits, a discretion "generally not subject to review," *United States v. Tucker*, 404 U.S. 443, 447, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972), coupled with the Parole Board's discretion to set the release date, led to unwarranted disparities in sentences. In 1958, Congress authorized advisory judicial sentencing institutes to promote "uniformity in sentencing procedures," 28 U.S.C. § 334(a), and to reduce "widespread disparities in the sentences imposed by Federal courts." H.R. Rep. No. 1946, 85th Cong., 2d Sess. 6 (1958). Although the Parole Board on its own, and its successor the Parole Commission at the urging of Congress, later adopted guidelines to establish customary ranges of confinement for various classes of offenders, the essential pattern remained: indeterminate sentences imposed by district judges and actual release dates set by the Parole Commission. *See, United States v. Grayson, supra,* 438 U.S. at 47–48, 98 S.Ct. at 2614; *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 391, 100 S.Ct. 1202, 1206, 63 L.Ed.2d 479 (1980). That pattern was based on the assumption that, "[r]eformation and rehabilitation of offenders ... [are] important goals of criminal jurisprudence." *Williams v. New York, supra,* 337 U.S. at

248, 69 S.Ct. at 1084. The impression persisted, however, that rehabilitation was a myth, and that unjustifiable sentencing disparity undermined public confidence in the government's ability to deal with crime.[1] Critics, including a former judge of this Court who professed to find his own and his colleagues' sentencing powers "terrifying," M. Frankel, *Criminal Sentences* 5 (1973), held out the promise that the intractable difficulties inherent in sentencing, which necessarily involves an attempt to reduce people and their behavior to numbers, would yield to enough effort by the right people applying modern techniques and technologies—a promise "so characteristic of the modern age." *United States v. DiBiase,* 687 F.Supp. 38, 39–40 (D.Conn. 1988) (Cabranes, J.).

The result was the Sentencing Reform Act. As Judge Ellsworth A. Van Graafeiland of the United States Court of Appeals for the Second Circuit has said, "[a]lthough only thirty-seven years have passed since those words [from *Williams v. New York, supra,* relating to the importance of rehabilitation] were written, we are now instructed that the beliefs they espoused are, to use a well-worn legal phrase, clearly erroneous. The principal aims of sentencing now are said to be retribution, deterrence, incapacitation and uniformity." Van Graafeiland, *Some Thoughts on the Sentencing Reform Act of 1984,* 31 Vill.L.Rev. 1291–92 (1986).

## B. *The Sentencing Commission*

The Act creates a Sentencing Commission "as an independent commission in the judicial branch of the United States."[2] 28

---

1. The degree to which the public accepts this perception may be illustrated in the following newspaper account of criticism leveled at National League President A. Bartlett Giamatti for imposing a four-day suspension on the Los Angeles Dodgers' Pedro Guerrero for throwing a bat, after having suspended the Houston Astros' Billy Hatcher for ten days for having cork in his bat. Hatcher's teammate Nolan Ryan was quoted as follows: "'There's been a lot of discussion about it around the Astros' organization' Ryan said. 'Billy Hatcher gets 10 days and the manager is fined $2,500. Now a guy gets four days for throwing a bat. I think it reflects our atti-

tude about the judicial system in the United States.

'You can commit some kind of crimes and get 30 years, but you can be a convicted murderer and be back on the street in 3 years. Not that Pedro Guerrero is a convicted murderer, but his offense could have been much more serious. How do you get out of the way of a flying bat? It's not easy.'" "Baseball Notebook—Judging the Judge," N.Y. Times, May 26, 1988, at D26, col. 4.

2. The legislation, to the extent based on the finding that "every day Federal judges mete out an unjustifiably wide range of sentences to of-

U.S.C. § 991(a). Of the Commission's seven voting members, "at least three ... shall be Federal judges selected after considering a list of six judges recommended to the President by the Judicial Conference of the United States." *Id.* All voting members are appointed by the President with the advice and consent of the Senate and all are "subject to removal from the Commission by the President only for neglect of duty or malfeasance in office or for other good cause shown." *Id.* The Attorney General sits *ex officio* as a nonvoting member of the commission. *Id.*

### C. The Commission's Charge Under The Act

The Act charges the Commission with creating guidelines that reflect several considerations, some contradictory, and that promote several goals of sentencing. Thus, the guidelines are to promote punishment, deterrence, isolation of dangerous persons, and rehabilitation; they are to "provide certainty and fairness" while "avoiding unwarranted sentencing disparities"; they are to "reflect ... advancement in knowledge of human behavior as it relates to the criminal justice process." 28 U.S.C. § 991(b)(1)(A)–(C). Those desiderata are set forth in the section containing the "purposes" of the Commission.

The Commission's "duties" are contained in a separate section of 24 sub-paragraphs, of which at least 16, many themselves further subdivided, address the substantive content of the guidelines and general policy statements the Commission was obligated to promulgate. 28 U.S.C. § 994 (a)–(n), (t), (v). Briefly, Congress instructed the Commission to define categories of offenses in relation to categories of offenders, and to prescribe a sentencing range for each. The maximum sentence must not exceed the minimum by more than the greater of 25 percent or six months. 28 U.S.C. § 994(b)(2). Certain categories of offense

and offender are singled out as appropriate for substantial imprisonment, 28 U.S.C. § 994(h), (i); others for probation. 28 U.S.C. § 994(j). Although the Commission was told to formulate its guidelines so as to "minimize the likelihood that the Federal prison population will exceed ... capacity," 28 U.S.C. § 994(g), it was told also that the guidelines should "reflect the fact that, in many cases, current sentences do not accurately reflect the seriousness of the offense." 28 U.S.C. § 994(m).

The sentencing judge may sentence outside the guidelines based on a finding that "an aggravating or mitigating circumstance" exists that was not "adequately taken into consideration by the Sentencing Commission in formulating the guidelines [and] that should result in a sentence different from that described." 18 U.S.C. § 3553(b). The defendant may appeal a sentence above the guideline range; the government may appeal a sentence below it. 18 U.S.C. § 3742.

### D. The Guidelines

The Commission has discharged its mandate by issuing guidelines based on a point system for classes of offenses and offenders. Offenses are divided into categories—Offenses Against the Person, Offenses Involving Drugs, etc.—and each is assigned a point value based on seriousness or degree of the offense. Points may be added for aggravating behavior committed in furtherance of or in connection with the subject offense, such that the effect is to consider the full extent of the defendant's wrongdoing. The total of these points yields an offense level. There is then computed a criminal history category relating to the offender—his role in the offense, his criminal history, the nature of the victim, if any, etc. The final step in applying the guidelines is to consult a chart of sentencing ranges showing the offense levels on one axis and the criminal history categories on

fenders with similar histories, convicted of similar crimes, committed under similar circumstances," S.Rep. No. 225, 98th Cong., 2d Sess. 38, *reprinted in* 1984 U.S.Code Cong. & Admin. News 3182, 3221 ("S.Rep.") would appear to be a vote of no confidence in the judiciary. To

that extent, placement of the Commission in the judicial branch, said to reflect "strong feeling that, even under this legislation, sentencing should remain primarily a judicial function," S.Rep. at 159, U.S.Code Cong. & Admin.News 1984, p. 3342, seems odd.

the other. The point at which they intersect contains the applicable sentencing range.

## II.

Defendant has attacked the guidelines on a broad front. In the order in which the arguments appear in her main brief, she asserts that the structure and function of the Commission violate the principle of separation of powers and deny her due process, that the Commission's authority to promulgate the guidelines results from an unconstitutional delegation of Congress' power, and that the sentencing judge's power to select and impose a particular sentence without giving a reason, provided the mandated guideline sentencing range is 24 months or less, denies her equal protection of the laws. In addition, she offers an array of reasons why the guidelines are inconsistent with the enabling legislation that authorized their promulgation, and accordingly are invalid.

The parties, and the Commission as *amicus curiae*, have assumed, and I think correctly, both the ripeness of this dispute for adjudication and the standing of this defendant to attack the guidelines on constitutional grounds, although the DOJ challenges her standing to object on statutory grounds to those guidelines that do not affect her.

The basic rationale of the ripeness doctrine, as summarized by the Supreme Court, "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). To decide whether an issue is ripe for determination, a court must evaluate "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515. When the issue is "purely legal" its resolution need not await factual development when undue hardship to the parties would

result. *Thomas v. Union Carbide Agricultural Products*, 473 U.S. 568, 581, 105 S.Ct. 3325, 3333, 87 L.Ed.2d 409 (1985). As Judge Leisure found in *United States v. Olivencia, supra*, there is no need for further factual development that would clarify the issues here because those issues are "purely legal." *Olivencia, supra*, at 10. Moreover, it is difficult to see what more this defendant could do to develop the factual record. She has pleaded guilty, and a presentence report has been prepared based on the assumption that because her crime was committed after November 1, 1987, she will be sentenced under the guidelines.

The need for a litigant to show standing is met by a showing of "injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury...." *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 79, 98 S.Ct. 2620, 2633, 57 L.Ed.2d 595 (1978). This is so whether the standing doctrine may be said to arise out of the Article III "case or controversy" requirement, *id.*, or out of the idea of separation of powers. *Allen v. Wright*, 468 U.S. 737, 761, 104 S.Ct. 3315, 3329, 84 L.Ed.2d 556. The "injury in fact" can but need not be "specific present objective harm"; "a threat of specific future harm" will do. *Laird v. Tatum*, 408 U.S. 1, 14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972). Here it might be urged that I must first find this defendant would receive a harsher sentence under the guidelines than she would otherwise before I can find she has standing to challenge the guidelines. That would raise several practical impediments, including a sentencing court's inability to predict when a defendant sentenced under the former statute would be released pursuant to guidelines applied by the Parole Commission. *See,* 28 C.F.R. § 2.20 (1987). Because this defendant's sentence is certain to be affected by the sentencing guidelines as well as by the Act's abolition of parole,[3] should she receive a custodial sentence, it is plain that Lydia Mendez faces a

---

**3.** Sentencing Reform Act of 1984, Pub.L. No. 98–473, 1984 U.S.Code Cong. & Admin.News (98 Stat.) 1987, 2027, *amended by* Sentencing Re-form Amendments Act of 1985, 1985 U.S.Code Cong. & Admin.News (99 Stat.) 1728.

sufficiently specific threat of future harm to confer standing to challenge the constitutionality of the Act to the extent she has, and to assert the statutory invalidity of those guidelines that may be read to apply to her, as set forth below.

Notwithstanding that defendant has treated the constitutional issues first, apparently in the belief that they give rise to her strongest arguments, and the Justice Department and the Commission have followed suit, I believe that prudential concerns require that I address first defendant's statutory challenges to the guidelines if they alone would be sufficient to prevent the guidelines from determining her sentence. More specifically, I should not "pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed." *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

### III.

Of the several statutory claims asserted by Mendez, at least two—that the absence of a separate guideline for determining in each case whether or not a probationary sentence may be imposed, and the alleged tendency of the guidelines to contribute to prison overcrowding, both violate the Act—would, if upheld, nullify virtually all guidelines for imposing prison terms. If that were the result, the guidelines in their entirety would be invalid because the Commission could not have intended the remainder of the guidelines to function independent of guidelines for imposing prison terms, which are at the core of why the guidelines were created in the first place. *See,* 28 U.S.C. § 994(*l*), (m); S.Rep. *supra* note 2, at 61, U.S.Code Cong. & Admin. News 1984, p. 3244. *Cf., Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 107 S.Ct. 1476, 1480, 94 L.Ed.2d 661 (1987) (Congress could not have intended that constitutionally flawed provision of a statute be severed if the balance of the legislation cannot function independently). Because in addition to her constitutional arguments Mendez has presented "other grounds upon which the

case may be disposed," *Ashwander, supra,* they must be considered first.

As Mendez points out, the guidelines were not passed by both houses of Congress and were not presented to the President for signature; therefore they are not legislation. *I.N.S. v. Chadha,* 462 U.S. 919, 946–951, 103 S.Ct. 2764, 2781–2784, 77 L.Ed.2d 317 (1983). If the guidelines are not consistent with the legislation that enabled the Commission to promulgate them, they are invalid to the extent of the inconsistency because the power of the Commission, like the power of any other administrative board, was only "to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity." *Manhattan Gen. Equip. Co. v. Comm'r,* 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936).

■ Mendez claims first that the Commission failed to obey the enabling legislation when it failed to enact "a guideline to determine 'whether to impose a sentence to probation, a fine, or a term of imprisonment.'" Mendez Br. at 67 (quoting 28 U.S.C. § 994(a)(1)(A)). But she misreads the statute. It does not direct the Commission to frame "a guideline" that prescribes that determination, but rather to draft "guidelines ... for use of a sentencing court in determining the sentence ... including (A) a determination whether to impose a sentence to probation, a fine, or a term of imprisonment." That is to say, all the Commission must do in this respect is what it has done, namely, to frame guidelines that determine the nature of the sentence. Nowhere in the statute is there any requirement that probation *vel non* must be the subject of a single and separate guideline to be applied before the sentencing court proceeds to determine the precise sentence.

Nor is defendant's claim that "Congress intended probation to be an equally available sentence option to imprisonment" borne out by the statute. Mendez Br. at 67. Not only did Congress take pains to

specify repeatedly those persons and deeds that warrant imprisonment, *see, e.g.,* 28 U.S.C. § 994(i), but it also directed more generally that the guidelines were to reflect the fact, as Congress saw it, that "in many cases, current sentences do not accurately reflect the seriousness of the offense." 28 U.S.C. § 994(m). That is not a mandate to make probation "equally available."

To the extent that Congress did direct that probation be available as a sentencing option, the Commission has obeyed. Thus the statute provides that the Commission must "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j). The sentencing table at Chapter Five, Part A of the guidelines, read with § 5B1.1 of the guidelines relating to probation, reflects that probation without imprisonment is appropriate for the first six offense levels when the criminal history of the defendant shows he is a first offender.

Finally, if Congress had intended to assure the availability of probation to the degree suggested by defendant, one would have expected it to say so in one of the detailed sub-paragraphs of 28 U.S.C. § 994. None of those sub-paragraphs carries the message defendant would read into the statute.

Defendant appears to argue further that when Congress enumerated in 28 U.S.C. § 994(d) some 11 offender characteristics for the Commission to consider, and then in § 994(e) specified that certain of them—education, vocational skills, employment record, family ties and responsibilities, and community ties—were inappropriate as a basis for recommending imprisonment, Congress was directing that those factors be considered separately as the basis for determining the availability of probation. Absent a guideline that does that, defendant suggests, the Commission has failed to follow Congress' direction. Here again I believe defendant misreads both the stat-

ute and its history. The specification of certain offender characteristics in § 994(e) merely assures that they will not be considered in recommending a prison sentence. But the obvious point here, made explicit in S.Rep., *supra* note 2, at 175, U.S.Code Cong. & Admin.News 1984, p. 3358, is that the specification in 28 U.S.C. § 994(e) was meant to "guard against the inappropriate use of incarceration for those defendants who lack education, employment, and stabilizing ties," not to assure the availability of probation under the guidelines for all defendants. Of course, to the extent the statute authorizes a sentencing judge to depart from the guidelines, 18 U.S.C. § 3553(b), it assures the availability of a probationary sentence to any defendant.

■ Next, Mendez asserts that the Commission has violated the statute by promulgating guidelines that will have the effect of increasing the prison population, perhaps beyond the limits of the prison system. The short answer to this claim is that the statute does not require that the Commission promulgate guidelines that will not increase the prison population, but merely that it consider their effect on the prison population before it promulgates guidelines. The mandate to "minimize the likelihood" of exceeding the limits of the prison system, 28 U.S.C. § 994(g) is only one part of this extensive statute, and was intended "to assure that the available capacity of the facilities and services is kept in mind when the guidelines are promulgated. It is not intended, however, to limit the Sentencing Commission in recommending guidelines that it believes will best serve the purposes of sentencing." S.Rep., *supra* note 2, at 175, U.S.Code Cong. & Admin. News 1984, p. 3358.

■ Defendant further asserts that the guidelines violate 18 U.S.C. §§ 3553(a) and 3583(a), and 28 U.S.C. § 994(a)(1)(C) by making supervised release following imprisonment mandatory in many cases, and imposing supervision for specified terms. Once more, I believe defendant has found a meaning in the statute that Congress did not put there. Section 3583(a) simply makes supervised release following impris-

onment available as a general matter; section 3583(c) requires that when a court imposes supervised release, it must do so only after considering certain of the specific factors listed in section 3553(a), including the guidelines; section 994(a)(1)(C) directs the Commission to give the sentencing judge a basis for determining whether to impose "a requirement that the defendant be placed on a term of supervised release after imprisonment, and, if so, the appropriate length of such a term." None of those sections, alone or together, give rise to the claim that in all cases the guidelines must permit the judge to dispense with post-release supervision. Rather, 28 U.S.C. § 994(a)(1)(C) does no more than require the Commission to give the judge a basis for determining when post-release supervision, a sanction (as this defendant perceives it) made available by 18 U.S.C. § 3583(a), should be imposed. This it has concededly done. When a sentencing judge considers imposing that sanction, the judge must consider certain factors specified in section 3583(c). Again, the guidelines do not restrict such consideration. If, after such consideration, the judge determines that, guidelines to the contrary notwithstanding, no post-release supervision is necessary, both the statute and the commentary to the guidelines permit the judge to depart from them. 18 U.S.C. § 3553(b); Commentary to Guideline § 5D3.1(a). Nothing more is required.

Defendant raises a similar contention with respect to fines. Section 3571(a) of Title 18 provides that a convicted defendant "may be sentenced to pay a fine." The guidelines, at § 5E4.2(a), require a fine in all cases unless a defendant cannot afford to pay one. That guideline is said to offend the permissive language of 18 U.S.C. § 3571. Again, I discern in section 3571 nothing more than the provision that makes fines available in appropriate cases as measured by standards set elsewhere. To the extent the legislative history bears on the issue, it suggests that Congress was anxious to see fines imposed more often, not less. *See*, S.Rep., *supra* note 2, at 103, U.S.Code Cong. & Admin.News 1984, p. 3286, referring to fines as "an inappropri-

ately underused penalty in American criminal law."

Defendant mounts a like challenge to guideline § 5G1.3, which directs that a sentence imposed on a defendant already subject to an unexpired sentence for an unrelated offense be consecutive to the earlier sentence. That is said to conflict with 18 U.S.C. § 3584(a), which provides that a term of imprisonment imposed upon a defendant already subject to an unexpired term of imprisonment "may run concurrently or consecutively," and provides further that terms of imprisonment imposed at different times "run consecutively unless the court orders that the terms are to run concurrently." Again, Mendez places more weight on general language—"may run concurrently or consecutively"—than it will bear. That language merely articulates the possibility that there may be circumstances in which a later term of imprisonment will run concurrent with or consecutive to an earlier term, but does not require that that possibility exist in every case. Mendez overlooks 28 U.S.C. § 994(*l*), which bears more directly on the issue and instructs the Commission to insure that the guidelines reflect the appropriateness of imposing "an incremental penalty for each offense" when a defendant is convicted "of . . . multiple offenses committed at different times." This challenge, too, must be rejected.

Defendant further taxes the guidelines for failing to promote, and in fact retarding, one of the major goals of the Sentencing Reform Act—the elimination of disparity in sentencing. This occurs, she says, because a defendant's criminal history score under the guidelines, which influences the length of the sentence that will be imposed, is based in part on the length of past sentences imposed on that defendant, which might themselves have resulted from unwarranted disparity. That result is claimed to offend one of the stated purposes of the Commission—to establish sentencing policies that "provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing

disparities among defendants with similar records." 28 U.S.C. § 991(b)(1)(B).[4]

Here, Mendez seeks to invalidate a regulation, and perhaps a whole set of regulations, based on a hypothetical possibility that the regulation might tend to disserve one of several generally stated goals of the Act. Yet given the uniformity of result that these guidelines are plainly designed to achieve over all—indeed, a uniformity of which Mendez elsewhere complains—it is unreasonable to insist that each and every guideline tend to promote that particular goal among the several set forth in the statute, especially when the challenged guideline permits a necessary calculation to be made in a rational manner. The purpose of the challenged guideline is to permit a sentencing court to determine how serious a defendant's prior convictions have been and to use that information in arriving at an appropriate sentence. It is not unreasonable to conclude that a serious offense would have generated a sentence longer than 13 months while a less serious offense would have generated a lesser sentence. No finer distinctions than that are to be drawn. Thus, a ten-year sentence and a three-year sentence both fall into the serious category under this guideline. Here it bears repetition that if the anomalies Mendez imagines, or others, ever come to pass, they can be brought to the attention of a sentencing court, which can then choose to depart from the guidelines. 18 U.S.C. § 3553(b). The alternative is to require that instead of using a relatively handy guide to seriousness of prior convictions, the Commission construct a detailed grid for evaluating the seriousness of prior behavior underlying convictions. That is a choice Congress gave to the Commission, 28 U.S.C. § 994(d)(10), not to this court.

▮ Finally, Mendez relies on several contentions that, for various reasons, she has no standing to raise. First among these is that the Commission's policy statement regarding defendants who cooperate with the government, Guideline § 5K1.1, is

potentially unfair to such defendants. No suggestion has been made that Mendez is a potential beneficiary of the challenged section. Raising no "claim of specific present objective harm or a threat of specific future harm," she has no standing to complain. *Laird v. Tatum, supra,* 408 U.S. at 14, 92 S.Ct. at 2326.

Mendez complains also that required reports to Congress from the Commission and from the General Accounting Office ("GAO") were received too late to have permitted Congress to have considered them in time for the guidelines to become effective on November 1, 1987, and that the GAO report was inadequate. Once more, Mendez is trying to fight a battle she has no standing to wage.

The reports in question were required to serve Congress' purpose, not hers. Section 235(a)(1)(B)(ii)(I) of the Act provides that the Commission was to submit with the initial set of guidelines a "report stating the reasons for the Commission's recommendations." Sentencing Reform Act of 1984, Pub.L. No. 98–473, 1984 U.S.Code Cong. & Admin.News (98 Stat.) 1987, 2032. Section 235(a)(1)(B)(ii)(II) of the Act provides that within 150 days of Congress' receipt of the guidelines, the GAO was to study their potential impact and report to Congress. *Id.* Passing the fact that the Commission's report appears to have been contained in the commentary to the guidelines themselves, neither report is there to serve any interest of Mendez as distinguished from any other citizen. When Mendez decries the timing and content of these reports, she can point to no injury peculiar to her, and is instead asserting merely the right to have Congress observe the law as she reads it. That is not a right she or anyone else may vindicate in a lawsuit. *Allen v. Wright, supra,* 466 U.S. at 754–61, 104 S.Ct. at 3326–29. Further, the GAO is itself an investigative agency of Congress. *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 3191, 92 L.Ed.2d 583 (1986). To the extent Mendez challenges

---

**4.** The relevant guideline, § 4A1.1, adds three points for each prior sentence exceeding 13 months, two points for each prior sentence exceeding 60 days and not previously counted, and one point for each additional prior sentence up to a maximum of four.

the adequacy of a report submitted to Congress by its own agency, GAO, she raises a dispute that cannot be resolved by judicially discoverable or manageable standards. The Act does not disclose what is an adequate report, and Congress has not conveyed that information anywhere else, so far as I am aware. Accordingly, the adequacy of the GAO report is a non-justiciable political question. *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962).

### IV.

The guidelines having survived defendant's statutory attack, it now becomes necessary to consider her constitutional arguments.

■ Defendant contends that the composition and function of the Commission under the Act violate the separation of powers doctrine in two ways: First, because the Commission performs what is essentially an executive or administrative function in carrying out the Act, the placement of the Commission in the judicial branch and the requirement that three Commission members be Article III judges is unconstitutional in that it compels judges to perform non-judicial duties and impairs the functioning of the judiciary. Second, the President's power to remove Commissioners itself allegedly violates separation of powers.

The Commission was created to "establish sentencing policies and practices," 28 U.S.C. § 991(b)(1), and to develop means to measure their effectiveness. 28 U.S.C. § 991(b)(2). Its central duty in fulfilling the first of these functions is the promulgation of sentencing guidelines. 28 U.S.C.

§ 994. The Commission argues strenuously that this is merely an adjunct to the performance of judicial duties, and thus is appropriately a judicial function. The Commission reminds us that the Supreme Court long ago recognized Congress' right to delegate to the judiciary the power "to regulate the practice and procedure of federal courts." *Sibbach v. Wilson & Co.,* 312 U.S. 1, 9, 61 S.Ct. 422, 424, 85 L.Ed. 479 (1941). But the sentencing guidelines are not merely administrative or procedural. They prescribe presumptive ranges of punishment that may be withheld only on a finding that some mitigating factor not considered in their formulation is present. 18 U.S.C. § 3553(b). Only then may judicial discretion control. When a rule that governs sentencing will "create a high hurdle that must be cleared before discretion can be exercised," such a rule "appears to have little about it that could be deemed procedural." *Miller v. Florida,* —— U.S. ——, 107 S.Ct. 2446, 2453, 96 L.Ed.2d 351 (1987) (invalidating *ex post facto* application of Florida's sentencing guidelines).

Certainly, examining the Commission's function is one way to test whether its power is executive, legislative or judicial. *I.N.S. v. Chadha, supra,* 462 U.S. at 963, 103 S.Ct. at 2790 (Powell, J. concurring in the judgment), and cases cited therein. What the Commission has been directed to do is to create substantive rules applying and interpreting the directives of the Act. "Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law." *Bowsher v. Synar, supra,* 106 S.Ct. at 3192.[5]

Because the Commission's function is executive,[6] it is necessary to consider whether

---

**5.** The only reasonable alternative to a finding that the Commission exercises executive power is a finding that it exercises legislative power. *Ex Parte United States,* 242 U.S. 27, 42, 37 S.Ct. 72, 74, 61 L.Ed. 129 (1916). When considering the propriety of prescribing Commission membership for those whose powers are limited to what is set forth in Article III, that is a distinction without a difference.

**6.** Although I have found that the Commission functions as an executive agency, I specifically decline to follow the suggestion in the DOJ brief

that we can disregard for all purposes the explicit direction in 28 U.S.C. § 991 that the Commission is "an independent commission in the judicial branch of the United States" and sever that language, treating it as a nullity because to regard the Commission as inherently judicial would raise constitutional doubts. *See, Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 107 S.Ct. 1476, 1480–81, 94 L.Ed.2d 661 (1987); *United States v. Vuitch,* 402 U.S. 62, 70, 91 S.Ct. 1294, 1298, 28 L.Ed.2d 601 (1971). It is true that from a constitutional standpoint the assignment of

Article III judges, whose power extends only to "Cases" or "Controversies," may serve on the Commission as the Act requires them to do.

Here, the DOJ argues that the three judges who serve on the Commission need not be seen to serve as judges, but only as Commissioners. The judges in question, we are told, serve only voluntarily and in their personal capacities. The DOJ reasons that because the Constitution contains a clause barring anyone who holds "any Office under the United States" from being a "Member of either House," U.S. Const. art. I, § 6, but contains no such incompatibility clause applicable to judges under Article III, federal judges may serve in executive offices. Warming to its subject, the DOJ cites numerous instances in which judges served in non-judicial roles, from John Jay's service as Ambassador to England, to John Marshall's brief tenure as Secretary of State, through Justice Jackson's role as this country's chief war crimes prosecutor at Nuremberg and Chief Justice Warren's chairmanship of the commission that investigated the assassination of President Kennedy; the DOJ concludes that there has been, in Justice Frankfurter's words, "a systematic, unbroken executive practice, long pursued" that should "be treated as a gloss" on the allocation of powers under the Constitution. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610, 72 S.Ct. 863, 897, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring).

There is ample room to quarrel with the DOJ's reading of history as it relates to the extra-judicial service of federal judges, *see,* Liman, *The Constitutional Infirmities of the United States Sentencing Commission*, 96 Yale L.J. 1363, 1381–84 (1987), but

its arguments suffer from more than bad history.

First, the Act does not make service by Article III judges optional. "At least three of the members *shall be* Federal judges selected after considering a list of six judges recommended to the President by the Judicial Conference of the United States." 28 U.S.C. § 991(a) (emphasis added). That provides a crucial distinction between this case and *Matter of President's Comm'n on Organized Crime—Subpoena of Scarfo*, 783 F.2d 370 (3d Cir.1986), on which the DOJ relies. That case upheld the validity of a subpoena by a presidential commission two of whose members were Article III judges. But one of the two factors the *Scarfo* court found significant was that "the service of the judges is voluntary. Neither the enabling statute nor the Executive Order mandates inclusion of judicial members." *Id.* at 376. In fact, that court drew an explicit contrast between the situation it faced and the one presented by the mandatory presence of Article III judges on the Commission here at issue. *Id.* at n. 3. This reasoning in *Scarfo* is entirely consistent with prior rulings by the Supreme Court "that executive or administrative duties of a nonjudicial nature may not be imposed on judges holding office under Art. III of the Constitution." *Buckley v. Valeo*, 424 U.S. 1, 123, 96 S.Ct. 612, 684, 46 L.Ed.2d 659 (1976), citing *United States v. Ferreira*, 54 U.S. 40, 13 How. 40, 14 L.Ed. 42 (1852); *Hayburn's Case*, 2 U.S. 409, 2 Dall. 409, 1 L.Ed. 436 (1792).

Finally, the DOJ argument based on the absence of an incompatibility clause in Article III proves far too much. It would permit Article III judges to serve in any

---

the Commission to the "judicial branch" seems irrelevant. The Constitution itself nowhere refers to "branches" of government. Rather, it simply allocates powers to Congress, to the President, and to the Supreme Court and "such inferior Courts as the Congress may from time to time ordain and establish" in Articles I, II and III, respectively. However, the statutory placement of the Commission in the "judicial branch" does have some intensely practical results, including exemption from the Freedom of Information Act, 5 U.S.C. § 552, the Privacy Act,

5 U.S.C. § 552a, certain prohibitions on discrimination, 42 U.S.C. § 2000e–16(a), and the President's budget cutting power, 31 U.S.C. § 1105(b), among other things. In these circumstances, it seems somewhat cavalier to argue, as does the DOJ, that "the only real-world consequence of the Judicial Branch label is that the Commission's checks are issued by the Administrative Office of the U.S. Courts, a fact with no constitutional significance." DOJ Br. at 59.

executive capacity—as SEC commissioners, prosecutors, you name it. Here I believe the DOJ has been led into mischief by finding too much significance in the incompatibility clause as a source of the separation of powers doctrine, and not enough in the constitutional allocation of powers itself. "The allocation of powers among the three branches is general in its terms but comprises an explicit textual recognition of the separation of powers principle. *See,* U.S. Const., art. I, § 1, cl. 1; *id.,* art. II, § 1, cl. 1; *id.,* art. III, § 1, cl. 1." *Chadha v. I.N.S.,* 634 F.2d 408, 420 n. 11 (9th Cir. 1980) (Kennedy, J.), *aff'd,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

### V.

There is one more argument that perhaps should be treated before reaching the conclusion that the Commission, and perforce its guidelines, must be found unconstitutional. One sentence of the DOJ brief suggests it: "Here, service by the three judges, one of whom holds senior status, on the Sentencing Commission clearly does not *materially* impair the ability of the federal Judiciary to function." DOJ Br. at 45 (emphasis added). The dissent in *United States v. Lopez, supra,* put it more forcefully: "The argument that the required presence of three judges on the Commission doing regulation writing work invalidates the legislation comes down to a concern about impurity of form.... However, our test is whether there is an impairment in fact in the operation of the judiciary; here there is none worth mentioning." 684 F.Supp. at 1518. A newspaper columnist put it more forcefully still: "The notion that the guidelines are unconstitutional because judges served on the commission is hokum. This is taking the doctrine of separation of powers and jumping off a cliff with it." Kilpatrick, *The judges need those guidelines,* Philadelphia Inquirer, June 3, 1988, 17–A.

This argument deserves an answer which, if it is to be found at all, must be found in the justification for the separation of powers. Here, courts look most often to the writings of Montesquieu, James Madison, and Alexander Hamilton. *See, e.g., Buckley v. Valeo, supra,* 424 U.S. at 120–21, 96 S.Ct. at 682–83, quoting from The Federalist No. 47 (Madison), of which the following is a fair sample: " 'The reasons on which Montesquieu grounds his maxim [that legislative, executive and judicial powers must be kept separate] are a further demonstration of his meaning.... "Were the power of judging ... joined to the executive power, the *judge* might behave with all the violence of *an oppressor.*" ' " (emphasis in original). Hamilton, citing Montesquieu, wrote that "liberty can have nothing to fear from the judiciary alone, but would have every thing to fear from its union with either of the other departments." The Federalist No. 78 at 504 (Hamilton), (Modern Library ed. 1937).

And yet, the image of three federal judges serving on a seven-member commission—court of appeals judges, no less, and one of them a senior judge—somehow fails to conjure up an instrument of oppression such as to put liberty in fear, even if they do sit cheek by jowl with the Attorney General, the nation's chief law enforcement officer, to determine federal sentencing guidelines. 28 U.S.C. § 991(a). Perhaps a lesson drawn from oppression nearer to our own day might help illustrate what is at stake in dismissing those Eighteenth Century warnings as concern over "impurity of form," *United States v. Lopez, supra,* or "hokum." Kilpatrick, *supra.*

To select, not entirely at random, a mature specimen of oppression, we can turn to the Soviet Union, and specifically to its Constitution, adopted in 1977.[7] It is somewhat surprising to an American, and might be to many Russians, to find that Chapter 6 of the Soviet Constitution guarantees, at least on paper, many more rights than our own vaunted Bill of Rights. In addition to such as "freedom of speech, of the press, and of assembly, meetings, street processions and demonstrations," Art. 50, "freedom of conscience, that is, the right to

---

**7.** Citations are to the *Constitution (Fundamental Law) of the Union of Soviet Socialist Republics* adopted by the 7th Extraordinary Session of the Supreme Soviet of the USSR (9th Convocation), October 9, 1977, *reprinted in Constitutions of the Countries of the World,* Binder XVII, pp. 18–47 (A. Blaustein & G. Flanz, eds. 1987).

profess or not to profess any religion" as well as separation of church and state, Art. 52, "inviolability of the person" from arrest "except by a court decision or on the warrant of a procurator," Art. 54, "inviolability of the home," Art. 55, and "privacy of citizens, and of their correspondence, telephone conversations, and telegraphic communications," Art. 56, the Soviet Constitution also purports to protect declared rights to rest and leisure, Art. 41, housing, Art. 44, and enjoyment of cultural benefits, Art. 46, among others.

But what virtually assures that these promises to the ear can be broken at will to the hope[8] is that the Soviet Constitution does not create a structure that can assure these nominal rights. More precisely, it does not separate powers, among other shortcomings.[9] To the contrary, "the leading and guiding force of Soviet society *and the nucleus of its political system, of all state organizations and public organizations,* is the Communist Party of the Soviet Union." Art. 6 (emphasis added). That is the antithesis of separation of powers, and it is what comes of compromising—or, at a minimum, it is the direction toward which tends any compromise of—such vital structural features of government as separation of powers.

Those being the stakes, it is small wonder that such relatively minor incursions as requiring judges to settle foreign claims, subject to review by the Secretary of the Treasury, *United States v. Ferreira, supra,* or directing them to certify the rights of pensioners, *Hayburn's Case, supra,* have been resisted on separation of powers grounds. Therefore, it does not seem too much to ask that Congress pursue the adoption of sentencing guidelines by creating a commission without also requiring that Article III judges serve on it.

## VI.

For the foregoing reasons, I find that the Act and the guidelines are unconstitutional.

Because it appears that abolition of parole was part of an integrated statutory scheme that included the sentencing guidelines, Mendez will be sentenced under the statute in force before the guidelines became effective. *Alaska Airlines, Inc. v. Brock, supra,* 107 S.Ct. at 1480. Inasmuch as the Parole Commission will remain in existence until 1991 even under the Act,[10] any delay in a decision by the Supreme Court should present no insurmountable obstacle regardless of what sentence she receives. Obviously, if the Court sustains the guidelines, Mendez will be resentenced in accordance with them.

In view of the above ruling, I find it unnecessary to reach any other of Mendez's constitutional claims.

SO ORDERED.

---

**8.** W. Shakespeare, *Macbeth,* Act V, Scene 7.

**9.** This point, or one very much like it, was made by Justice Scalia in a speech at the courthouse in Bedford, New York in October, 1987.

**10.** Sentencing Reform Act of 1984, Pub.L. No. 98–473, 1984 U.S.Code Cong. & Admin.News (98 Stat.) 1987, 2032, *amended by* Sentencing Reform Amendments Act of 1985, 1985 U.S.Code Cong. & Admin.News (99 Stat.) 1728.